IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| KENT H. MIDDLETON, JR., as | ) | Civil Action No.: 7:10-02529-MGL |
| Personal representative of | ) | |
| The Estate of Amanda Middleton, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Nissan Motor Company, Ltd., | ) | |
| Nissan North America, Inc., | ) | |
| Autoliv, Inc. and Autoliv ASP, Inc. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM IN RESPONSE**
**TO DEFENDANTS' MOTION FOR LEAVE OF THE COURT TO CONTINUE THE**
**DEPOSITION OF PLAINTIFF'S EXPERT CRAIG GOOD**

The Defendants have moved the Court for leave to continue the deposition of Dr. Craig Good, the seat belt expert presented by the Plaintiff in this case. Dr. Good was previously deposed for approximately seven hours on May 30, 2012. The Plaintiff requests that the Court deny the Motion to Continue Dr. Good's deposition for the following reasons.

1.  Dr. Good has already been deposed for approximately seven hours which is the maximum time permissible under the Federal Rules. Rule 30 (d)(1) Fed. R. Civ. P.

2.  The Defendants did not request that Dr. Good's deposition be "resumed" until more than six months after his initial deposition and after the Plaintiff had deposed Defendants' seatbelt expert. The delay

in requesting a resumption of Dr. Good's deposition, based on a review of materials produced at his deposition, should be considered a waiver of this argument and not considered as a basis for granting the requested relief. <u>See</u> 12/18/2012 E-mail, attached as **Exhibit 1.**

3.  Dr. Good has given one deposition in which he was thoroughly examined on his opinions.  Rule 30, Fed. R. Civ. P., provides that only one deposition may be taken of a witness.  While the motion is couched as a continuance of Dr. Good's deposition, it is in reality a second deposition.  The Defendants have failed to make the requisite showing under Rule 26(b)(2) for the Court to grant leave for a second deposition.

4.  The Defendants have already taken 22 depositions and have at least one more scheduled.  Rule 30, Fed. R. Civ. P., limits the number of depositions to 10 per side.  The Plaintiff does not stipulate to an additional deposition of Dr. Good and the Defendants' have failed to make the requisite showing under Rule 26(b)(2) for the Court to grant leave for an additional deposition.

## BACKGROUND

This case involves claims that the 2000 Nissan Xterra that Amanda Middleton was driving was not crashworthy due to a defect in the seat belt system that allowed it to unlatch during the rollover accident that ultimately led to her death.  The Plaintiff's experts have opined that, based on physical evidence on the seatbelt and on Mrs.

2

Middleton's body, that she was wearing her seat belt at the beginning of the rollover. Craig Good, Ph.D., a mechanical engineer with experience in the design of seat belt buckles and in investigating buckle performance in collisions, opined that the seatbelt buckle released in the rollover because of its propensity to false latch.

False latch is a condition where a seatbelt buckle appears to the occupant to be latched but it is in fact not fully latched which in turn can allow it to release due to forces in an accident.   False latch is something that the auto manufacturers, buckle manufacturers, and the governmental regulators recognize as a safety issue that must be protected against in the design of the buckle.   One of the recognized potential causes of false latch is the introduction of foreign materials into the buckle such that it interferes with the latching function of the buckle.  Autoliv's design documents recognize that one source of foreign debris is the plastic used to make up the buckle cover and that this can render an occupant not fully restrained.  This condition is considered within the highest of safety risks that must be prevented by design.

A portion of the buckle cover from Mrs. Middleton's seatbelt buckle is broken free.  Dr. Good opined that the broken plastic was the likely cause of the false latch condition that allowed Mrs. Middleton's buckle to release.  In support of his opinion, Dr. Good tested the subject buckle to determine the areas that a broken piece of plastic could end up and what effect the broken plastic could have on the latching function of the buckle.  Dr. Good demonstrated that when a plastic chip from the buckle cover is ingested into the buckle, that it can move into a position that prevents the internal lock for the buckle latch from fully engaging.

3

This "lock for the latch" or lock bar is a safety feature that prevents the latch from moving, thus keeping it fully engaged into the latch plate while the vehicle is being operated and during an accident.  When the lock bar is not fully seated on both sides, the buckle in the 2000 Nissan Xterra is in a condition of false latch and will release.  Dr. Good's testing demonstrated this to be true.  He has also investigated at least two other cases involving the same or substantially similar buckle where he determined the buckle released due to false latch.  One of these cases involved a false latch condition caused by a piece of plastic buckle cover from the same location as involved in the Middleton buckle.

In his Rule 26(f) Report, Dr. Good referenced the testing he performed to replicate the subject buckle's propensity to false latch.  **ECF 40-2 thru 40-4.**  On the afternoon prior to his deposition, Dr. Good did additional testing of the same nature which was recorded on video.  The results were the same as what he set forth in his Rule 26(f) Report on this subject.   The video and the notes from this testing were provided prior to beginning Dr. Good's deposition on the following morning.

Dr. Good was deposed on May 30, 2012 at Plaintiff's counsel's office in Hampton, South Carolina, in a wide ranging deposition that began at 9:53 a.m. and concluded at 5:48 p.m.  Plaintiff's counsel produced Dr. Good for a deposition at their office in Hampton, South Carolina per an agreement of counsel that all experts would be produced in South Carolina.  Dr. Good lives and works in Calgary, Alberta Canada. Other than a short recess for lunch, and other breaks to change video tapes, Dr. Good

4

was questioned continuously during this period of time by counsel for the Defendant's.[1] Counsel for the Plaintiff did not ask any questions during this deposition.

Despite the fact that the Defendants had three attorneys at the deposition, and did review many, if not all of the video segments provided at Dr. Good's deposition, defense counsel made reference to a potential need to resume the deposition for additional questions as to the content of the video segments.  This is the only topic that was articulated as a basis for any need to resume the deposition and thus it must be presumed that complete questioning was had as to all other topics.  No agreement or stipulation was reached to resume the deposition.  See 12/26/2012 E-mail, attached as **Exhibit 2.**  Likewise, there was no suggestion by the witness or Plaintiff's counsel that the deposition needed to end at a specific time.

Counsel for the Plaintiff deposed Dr. William Van Arsdell on November 7, 2012. Dr. Van Arsdell is the seat belt buckle expert hired by the Defendants.  At no time between May 30, 2012, and November 7, 2012, did the Defendants request to resume Dr. Good's deposition. Dr. Arsdell prepared a Rule 26(f) Report on July 31, 2012.  See 7/31/2012 Rpt., attached as **Exhibit 3**.   Later, Dr. Arsdell fully expressed his opinions at his deposition.  He did not suggest at any point that he did not understand Dr. Good's

---

[1] The Defendants admit that this deposition lasted at least six and one half hours.  The Plaintiff believes that it lasted at least seven hours.

testing or that he needed additional testimony from Dr. Good to fully understand and address any aspect of Dr. Good's testimony or file.[2]

In December 2012, after Dr. Van Arsdell's deposition, the Defendants made a request to take a second deposition of Dr. Good. The reason given is that it had taken many hours to review the video provided the day of his deposition and the review had raised some issues. This explanation was provided on December 18, 2012, over a month after Dr. Van Arsdell's deposition and almost six months after Dr. Good's deposition. No explanation was provided to justify the long delay in making the request or the timing of the request relative to Dr. Van Arsdell's deposition. <u>See</u> 12/18/2012 E-mail, attached as **Exhibit 1.**

After reviewing the transcripts of both Dr. Good and Dr. Van Arsdell, the Plaintiff declined to agree to a second deposition of Dr. Good. The reasoning for refusing the request is multifaceted. It includes the fact that Dr. Good had been deposed for most if not all of the allowable seven hour time period, the late timing of the request, the expense to Plaintiff, and most important that Dr. Good had already testified extensively about the testing captured in his video. <u>See</u> 12/26/2012 E-mail, attached as **Exhibit 2.** The overwhelming majority of the questioning of Dr. Good on Pages 36-99 and 143-149 involved the same testing at issue on the video. 5/31/2012 Deposition of Good, attached as **Exhibit 4** at Pages 36-99 and 143-149. Approximately seventy pages of testimony on the very testing that the Defendants now seek a second deposition.

---

[2] Notably absent from Defendants' Motion is any suggestion that its expert or corporate representatives need additional information from Dr. Good with the exception of the Finite Element Analysis raw data, which is being provided.

After receiving the deposition of Dr. Van Arsdell, Dr. Good prepared a Rebuttal Report to address some of the issues raised by him during his testimony.  **ECF 108-1.** The report spells out the reasoning and basis for the additional work.  This report largely reiterated and reinforced the same opinions provided in Dr. Good's initial report (**ECF 40-2 thru 40-4)** and in his deposition.  It was truly a rebuttal report targeted at statements and opinions offered by Dr. Van Arsdell.  The Defendants again requested a second deposition of Dr. Good without limitation.  Given the time and expense of producing Dr. Good from Canada, or traveling to Canada for a second deposition, the Plaintiff proposed a telephonic deposition limited to two hours; which was rejected by the Defendants and led to the current motion.[3]  At issue here is whether the Defendants have shown good cause to warrant a second deposition of Dr. Good.

## DISCUSSION

The Federal Rules of Civil Procedure provide that each side in a civil action can take up to ten depositions without leave of the Court.  Rule 30(a)(2)(A)(i). Fed. R. Civ. P.  The Rule limits the duration of a given deposition to "1 day of 7 hours." Rule 30(d)(1) Fed. R. Civ. P.  Without leave of the Court a party may only be deposed once during the case.  Rule 30(a)(1)(2)(A)(ii) Fed. R. Civ. P. "Absent a showing of good cause, generally the court will not require a witness to appear for another deposition." Express One International Inc. v. Sochata, 2001 WL 363073 (N.D. Tex 2001) (Denying the request to

---

[3] In footnote three (and subsequent filings) counsel for Nissan has represented that counsel for the Plaintiff was refusing to allow any depositions to be taken without leave of the Court.  Much to the contrary, the Plaintiff offered a two hour telephonic deposition of Dr. Good.  In addition, the Plaintiff has participated in the deposition of Russell Dunn, Ph.D. on February 22, 2013 (one day after this statement was made) and has worked to schedule the deposition of Dr. Oliver Wood. (Although named as a witness since January 2012, the Defendants did not attempt to depose him until the week before the scheduling order discovery period was to end on January 29, 2013.)  In addition, Plaintiff's counsel has agreed to work with counsel for the Defendants in an effort to depose the pertinent Nissan customers identified in Nissan's discovery and named as potential witnesses by the Plaintiff.

7

take a second deposition of an expert following a Rebuttal Report that addressed the same subject as the deposition already given.)

Dr. Good has already been deposed for approximately 7 hours. In addition, the parties have taken to date 37 depositions. The Defendants have taken 22 of these depositions with plans to depose Dr. Wood and some or all of the Nissan customers listed by the Plaintiffs. The Defendants now desire a second deposition of Dr. Good to ask questions about a Rebuttal Report. At some point, there needs to be an end which is consistent with the limitations on discovery contained in the Federal Rules of Civil Procedure.

Rule 30(a)(2) allows the Court to grant a second deposition of witness and/or a party to take depositions beyond the ten per side limit as may be consistent with Rule 26(b)(2), which provides:

> **[T]he court must limit the frequency or extent of use of the discovery methods otherwise allowed by these rules or by local rule if it determines that (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery had ample opportunity to obtain the information by discovery in the action; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake In the action, and the importance of the discovery in resolving the issues.**

A review of the arguments presented by the Defendants in support of a second deposition of Dr. Good fail to address the Rule 26(b)(2) analysis and fall far short of

8

demonstrating good cause.  The reason advanced by the Defendants is to bolster a Rule 702 challenge; a challenge they already confidently predict will be decided in their favor. There is no claim that the Defendants or their expert do not understand the methods employed by Dr. Good.  In fact, their seatbelt expert, Dr. Van Arsdell, performed two sets of testing that reached almost identical results with regard to the positions a plastic chip can lodge within the buckle.  He simply disagrees with Dr. Good that the plastic chip as lodged in the various positions observed by both experts, causes the buckle to false latch.

> Q.    So as I'm - -  I understand, after doing your evaluation, it's not that you necessarily disagree that the chip could get into the buckle mechanism as shown in your work and Dr. Good's, it's just that you disagree with the opinion that that causes a partial or false latch?

> A.    Correct.

**11/7/2012 Deposition of William Van Arsdell, Ph.D., attached as Exhibit 5 at Page 158, Line 20 – Page 159, Line 1.**

Both experts agree that the plastic chip can enter the buckle and lodge in a position where the lock bar will not fully seat on both sides.  They disagree as to whether the buckle will release with the lock bar not fully seated on both sides.

The Defendants and their expert already have a clear understanding of Dr. Good's work and opinions, which are unchanged by his Rebuttal Report. **ECF 108-1**. Nonetheless, counsel for the Defendants now see some need to ask additional questions about Dr. Good's testing to support a Rule 702 motion to limit his testimony. To support this desire for a second deposition, the Defendants have mischaracterized the record resulting in a gross overstatement of the need for a second deposition.

The data contained in Dr. Good's Rebuttal Report and the accompanying materials are not the "the bulk" of his work dumped on the Defendants on the last day of discovery as suggested by the Defendants.  The Defendants would have the Court believe that the Plaintiff has at the last minute provided new defect opinions previously unknown to them such that prejudice will result in the absence of a second deposition. The arguments, based on Dr. Good's Rebuttal Report, begin on Page 7 of the Motion for Leave of Court to Continue the Deposition of Plaintiff's Expert Craig Good. **ECF 112.**

The Defendants begin by stating that Dr. Good has offered "new opinions regarding how the unlatching occurred" such "that the buckle unlatched due to extraordinary uniaxial forces" as seen in another collision involving a substantially similar buckle.  This statement references section 4.00 of Dr. Good's Rebuttal Report. **ECF 108-1.**  In this section, Dr. Good reports on a substantially similar Autoliv buckle in a 2002 Mazda Protégé that false latched and released due to a broken guide vane interfering with the latch mechanism.

The citation to this field collision and Dr. Good's testing in that case was presented to rebut Dr. Van Arsdell's opinion that the Autoliv K-12 buckle is fully latched with only one side of the lock bar seated.  Thus, the results of Dr. Good's investigation and testing from that case will be presented to dispute the Defendants' expert on this issue by demonstrating one mode in which the buckle will open with a plastic chip interfering with the latching mechanism and preventing the lock bar from fully seating.

Nowhere in the Rebuttal Report does Dr. Good suggest that the subject buckle released in *this collision* due to the type of forces at issue in the field collision involving

10

the 2002 Mazda Protégé.  Instead, Dr. Good offers this real world collision and his testing from that case as proof that the buckle will not remain latched where only one side of the lock bar is seated.  In that case, the buckle opened due to crash forces physically pulling on the latch plate that caused the partially latched buckle to open.

The Defendants have clearly misstated Dr. Good's report to suggest that he is offering the 2002 Mazda Protégé buckle release as a new theory of how the buckle opened in this case.  There is no way to read Dr. Good's Rebuttal Report in a manner consistent with the Defendants' argument that this was offered as a "new opinion regarding how the unlatching occurred" in this case.

Within this same argument, the Defendants state that the Mazda Protégé collision investigated by Dr. Good was previously undisclosed in this case.  It is alarming that the Defendants would make such a representation given that Dr. Good was asked about other events in his deposition and he clearly disclosed this investigation.  Dr. Good was asked about that case – pending in Canada – by counsel for Nissan. See 05/31/2012 Deposition of Good, attached as **Exhibit 4** at Page 138, Line 16 through Page 142, Line 23.  In this questioning and on Page 295, Dr. Good reminded the Defendants that Autoliv employee and 30(b)(6) designee, Timothy Cahill, was present when the 2002 Protégé  buckle in that case was torn down.   See 05/31/2012 Deposition of Good, attached as **Exhibit 4** at Page 295, Lines 18-23.  That counsel for Nissan was aware of the case is evident in his questioning of Dr. Good.

Q.    Where is it pending?

A.    It's pending in Canada.  You - - you should talk to your expert, Mr. Cahill.  He was there when that buckle was disassembled.  And - -

11

Q.    I don't think Mr. Cahill has been identified as an expert in this case. In - - in any event, he wouldn't be my witness.

A.    Okay. Well, I'm just letting you know that - - that Mr. Cahill was - - was present when that buckle was disassembled.

Q.    Wasn't that buckle literally torn apart when it came - - or if it released in that case, wasn't it torn apart in the process?

A.    By - - by mechanisms of false latching. There was - - there was evidence - - physical evidence of false latching in that case.

Q.    There any physical evidence of false latching in this case on the buckle?

A.    There is evidence that this occupant was wearing a seat belt.

Q.    No, I'm talking about the kind of physical evidence you were just referring to in the Mazda case, where the buckle is damaged. Is there any such physical evidence in this case in the buckle?

A.    No, there's no evidence that the buckle is damaged other than the chip being missing and – but the evidence that we have to indicate that she's belted is other physical evidence.

Q.    It's – there's evidence in the Mazda case of damage to the buckle; correct?

A.    That – that's correct. There – the – portions of that buckle have been overloaded.

**5/31/2012 Deposition of Good, attached as Exhibit 4 at Page 140, Line 17-Page 141, Line 25.**

Autoliv was a defendant in that lawsuit with a representative present and aware of the buckle and claims. Nissan's counsel clearly knew much more about the case than he got from questioning Dr. Good. Moreover Dr. Good <u>did</u> disclose this information in his deposition. To say it was undisclosed and suggest that these Defendants have no

knowledge of this incident is a mischaracterization of the testimony which is presented as a basis to take a second deposition of Dr .Good.

The next argument made in support of a second deposition of Dr. Good similarly misstates the record and testimony in this case. The Defendants state "Dr. Good opines for the first time in his new report how the push pull condition – the basis for his defect theory – may have occurred in this rollover through inertial loading or occupant contact." Motion for Leave of Court to Continue the Deposition of Plaintiff's Expert Craig Good-

**p. 8, ECF 112.**

In his May 30, 2012 deposition, Dr. Good clearly talked about the "push/pull" action as a means for the buckle tongue to disengage when a plastic chip was located within the latching mechanism.  He also related the "push/pull" action to what occurs in a rollover accident.

Q.    Well, have you pulled the tongue out when the one side of the lock bar is engaged in the L-Slot?

A.    Yeah – the you can – you can – you can – if you give that - such as in a rollover, if you push that buckle – if you push that buckle in and pull it out, it comes out right away.

**05/31/2012 Deposition of Good, attached as Exhibit 4 at Page 76, Lines 4-11**.

Q.    What's your basis for that opinion?

A.    If you push the tongue in and pull it out, it comes out.

**Id**. **Page 77, Lines 2-4.**

Q.    And when there is that audible click, have you ever, then pulled the tongue out of the buckle without depressing the button?

A.    Yes.  It - - in that - - as we've told you before, in the situation when the bar is in one side and not in the other, if you push the tongue down without pressing the button and pull the tongue out, it will come out.

Q.    First press it down?

A.    So the tongue goes – gets pushed down – like if, say, it would be bumped in a rollover collision and its gets pushed down, it comes back out and out it comes.

**Id. Page 259, Lines 12-24.**

To state that Dr. Good has offered a new opinion concerning the mechanism of how the subject buckle can unlatch as a result of its propensity to false latch is an inaccurate portrayal of the record.  The ten new short videos and 156 photographs, provided along with Dr. Good's Rebuttal Report, simply show what Dr. Good testified to in his May 30, 2012, deposition.  The only thing new is that he measured the initial extraction forces which were recorded on a force gauge and depicted in the video and photographs.  In the video, one can plainly see Dr. Good attach the force gauge to the latch plate, pull on the force gauge, and record the number shown on the gauge.  The purpose of this exercise was to rebut criticisms of Dr. Van Arsdell that he did not measure this aspect of the prior testing.

After the force gauge is removed, Dr. Good removes the tongue from the buckle using the same push/pull procedure which he described in his May 30, 2012, deposition.  The Defendants were told about this procedure in his prior deposition and had ample opportunity to question Dr. Good on this issue.  The fact that he now provides a video of what he already described as the test procedure used in his initial report does not make this a new opinion and does not warrant an additional deposition.

14

The two "new" pieces of information provided to the Defendants along with Dr. Good's Report are 16 microscopic photographs of the buckle fracture surface and a Finite Element Analysis of Dr. Good's alternative feasible design.  The photographs of the fractured buckle cover are simply close-up views of the area in question that give more detail than the numerous other photographs of this area taken by experts on both sides.  The photographs were taken by Russell Dunn Ph.D., who was deposed on February 22, 2013 concerning these photographs.  The fact that additional photographs were taken of the subject buckle does not create some new defect theory or add some new element to this case.  The Defendants' expert testified that the fracture surface of the plastic buckle cover appeared old.  To assess and to rebut this characterization, the Plaintiff took additional photographs.  The fact that two experts in a products liability case will look at photographs of the same area and draw different conclusions is nothing new nor does it create a basis for a second deposition.  To the extent these 16 photographs warrant a deposition, it is clearly something that can be done telephonically.

As to the Finite Element Analysis (FEA) materials, this involves a computer analysis of the alternative design offered at Dr. Good's May 30, 2012, deposition. Although Dr. Good explained the alternative design in his deposition and offered a competitive buckle cover from the same time period that incorporated his design change, the expert for the Defendants was critical of the fact that he had not tested the change.  Although Dr. Arsdell was critical of the lack of testing, he admitted "I haven't given much thought" to what testing would be sufficient.  See 11/7/2012 Deposition of

15

Van Arsdell, attached as **Exhibit 5** at Page 160, Line 16. In other words, he is critical of what Dr. Good says, but critical without giving it much thought.

Despite the obvious and well known strength gained from adding a brace or rib to strengthen a structure, Dr. Good went a step further and performed an FEA of the proposed design change. There is no new opinion here. The Defendants' expert did not testify that Dr. Good's proposed design would not work or was not feasible. He testified that "he did not flatly disagree" with the proposed design change but would not agree with his opinion "without analysis". See 11/7/2012 Deposition of Van Arsdell, attached as **Exhibit 5** at Page 159, Lines 10-11. He admitted that he had not performed any analysis from which to be critical. The FEA was simply an exercise performed in rebuttal to Dr. Van Arsdell's statement that the design proposal required additional analysis. It did not change Dr. Good's opinion and does not justify a second deposition. To the extent the Court decides this warrants a deposition, it is something that can be done telephonically.

Examination of the five points put forth in support of the request to continue the deposition of Dr. Good, in light of the applicable standard for granting expanded discovery, weighs heavily in favor of denying the Motion. First, there is no showing that the Defendants did not have ample opportunity to question Dr. Good at his May 30, 2012, deposition regarding the testing in his report and presented at his deposition. In fact, as set forth above, the Defendants questioned him for more than 70 pages on this testing. If, indeed, additional questions arose after viewing the video provided the morning of the deposition, surely a timely request to resume his deposition would have

16

been made before six months lapsed. The unreasonable lapse in time together with the fact that the Defendants' seatbelt expert did the exact type of testing demonstrate that the real driver behind the request for expanded discovery is that counsel has thought up some more questions they want to ask in support of the Rule 702 motion to challenge Dr. Good's testimony. The Defendants have had "ample opportunity" to ask Dr. Good about his testing.   That, six months later, they have now thought up additional questions, they would like to have answered is not sufficient to warrant the burden and expense of another deposition.

Likewise, because the Defendants had ample opportunity to question Dr. Good on his "push/pull" theory of unlatching, this stated ground does not support a second deposition.  No matter how many times the Defendants call what they see in the videos supplied with the Rebuttal Report a "new defect theory", they cannot escape the fact that Dr. Good described this in his May 30, 2012, deposition.  Since they elected not to question him more on this issue is of no benefit in their effort to get a second unlimited deposition of this witness. It is noteworthy that defense counsel never asked Dr. Good if or how the unlatching theory related to his opinion as to how the subject buckle unlatched in the subject accident.  In fact, it does not appear that Dr. Good was ever asked to explain how he believed the seatbelt unlatched during the accident.  This likely explains the current push for a second deposition.

As set forth above, Dr. Good referenced the push/pull or in/out action of the buckle tongue as the mode of buckle release in response to four questions.  There was

clearly ample opportunity for counsel to ask all of the questions deemed pertinent to the understanding of this part of his testing or necessary to mount their Rule 702 challenge.

Taking the Defendants' calculation of the length of Dr. Good's deposition as accurate, there was at least an additional 30 minutes that could have been devoted to asking additional questions on what is now argued as the most important part of Plaintiff's defect theory.

In addition, to having ample opportunity to question Dr. Good on this issue, he has provided a supplemental report and provided video of the buckle removal using a push/pull action.  To this end, the Defendants have another source for this information that is more convenient, less burdensome, or less expensive than a full blown deposition where it seeks to ask more about a topic already covered in a prior deposition.  Again, it appears that the real reason behind this deposition is not to gain an understanding of what Dr. Good did (as it is clear in the video) but instead to ask "sound bite" producing questions in preparation of a Rule 702 motion to limit or exclude Dr. Good's opinions.  The Defendants had this opportunity and failed to ask the questions they now wish to ask.  This is the type of situation where the federally mandated limitations on discovery are intended to prevent.  Rule 26 (b) (2) mandates a denial of the motion with regard to any questioning on this topic.

The same argument is applicable to the 2002 Mazda Protégé field investigation. While the Defendants tell this Court that the first disclosure of this investigation came in the rebuttal report, the above quoted excerpts from Dr. Good's deposition make it clear that not only did Dr. Good disclose his work on that case but that defense counsel was

intimately aware of the buckle failure and Dr. Good's involvement. What's more, is that the very corporate representative designated by Autoliv in this case was with Dr. Good when they opened the buckle in the Protégé case. The Autoliv representative actually inspected the buckle in that case. Not only have the Defendants had ample opportunity to obtain discovery on the Protégé buckle in this action, they have firsthand knowledge of that buckle release and all pertinent allegations. Requiring Dr. Good to sit for another deposition on this issue, especially given the mischaracterization of the testimony, would be unjust. The Defendants have failed to make any showing as to why additional discovery should be had on this issue.

The Plaintiff does not believe that the Defendants have made the needed showing to warrant a second deposition of Dr. Good as to the FEA and 16 microscopic photographs given the ability to obtain this discovery from other less burdensome and less expensive means. First, Dr. Good has provided a detailed report, photographs, video and is in the process of providing the raw FEA data. Second, the Defendants deposed the person who took the photographs. There has been no suggestion or showing that the Defendants do not understand Dr. Good's Report or these other materials such that a second deposition is warranted. Should the Court grant a second deposition on these issues, the Plaintiff request the Court to limit the questioning in time and scope consistent with Rule 26 (b) (2).

## **CONCLUSION**

The Defendants' motion to continue the deposition (second deposition) of Dr. Good should be denied.  Not only did the Defendants have ample opportunity to obtain discovery at the time of his deposition, they waited for six months after his deposition to request a follow up deposition.  A request based on issues identified in the review of the video.  The lapse in time should be deemed a waiver of any right to ask additional questions concerning the initial testing and is an additional ground for the denial of the motion.

Additionally, the Defendants have had ample opportunity to conduct discovery concerning the so called push/pull method of buckle release and the 2002 Protégé field investigation.  The fact that the Defendants inaccurately tell this Court that they just learned of this information via the Rebuttal Report does not make it so.  They knew about it and had an opportunity to ask questions about it.  Accordingly, the Court should deny the motion to the extent the Defendants seek to question Dr. Good on these issues.

The Plaintiff also requests the Court to deny the motion as to the FEA and 16 microscopic photographs.  Alternatively, the Plaintiff request the Court to limit the amount scope and time for any deposition these issues and that such the deposition be done telephonically.  Requiring Plaintiff to produce Dr. Good for a deposition in South Carolina or traveling to Canada for a second deposition is a major expense, especially in light of the extensive testing illicit  in Dr. Good's first deposition.  The Plaintiff would

suggest that an additional one-two hours deposition via telephone is reasonable if the Court grants the motion.

David Yarborough, Esq.
Fed ID #7336
david@yarboroughapplegate.com
William Applegate, Esq.
Fed ID #9261
YARBOROUGH APPLEGATE, LLC
PO Box 20398
Charleston, SC 29413
(843) 972-0150: Phone


~and~


PETERS, MURDAUGH, PARKER, ELTZROTH
& DETRICK, P.A.


BY:  /s/ Ronnie L. Crosby
       Ronnie L. Crosby
       Fed ID #6311
       rcrosby@pmped.com
       William F. Barnes, III
       Fed ID #10639
       wbarnes@pmped.com
       PO Box 457
       101 Mulberry Street East
       Hampton, SC 29924
       (803) 943-2111: Phone
       (803) 943-3943: Fax
       **ATTORNEYS FOR PLAINTIFF**

March  11 , 2013
Hampton, South Carolina