IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| Kent H. Middleton, Jr., as Personal Representative of the Estate of Amanda Middleton, | ) ) ) | Civil Action No.: 7:10-cv-02529-MGL |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Nissan Motor Company, Ltd., Nissan North America, Inc., Autoliv, Inc. and Autoliv ASP, Inc., | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE ALL "OTHER INCIDENT" EVIDENCE

The Plaintiff, by and through his undersigned counsel, submits this memorandum of law in opposition to Defendants' Motion *in Limine* to Exclude All "Other Incident" Evidence filed February 28, 2013. Defendants move *in Limine* to exclude any evidence or testimony related to any alleged other incidents because 1) no other incident evidence arose after the April 14, 2000 distribution of the subject vehicle; 2) no evidence that any other incident, claims, or complaints arose from the same cause and condition; 3) any probative value is substantially outweighed by the danger of unfair prejudice; and 4) any testimony or evidence about other alleged incidents would be inadmissible hearsay based solely upon what the witness heard or read.

As will be discussed in greater detail below, Defendants' Motion should be denied for the following reasons:

1.     The post-distribution evidence Defendants seek to exclude should be ruled upon at the trial of this case in order to afford the Plaintiff an opportunity to call the witness and the Court an opportunity to determine what purpose the evidence is being offered and whether it is admissible.  Evidence which is admissible for one purpose but not another purpose may be limited and the jury instructed accordingly. Fed. R. Evid. 105.

2.     The Post-Distribution Rule relied on by the Defendants is an evidentiary rule governing the admissibility of evidence in product liability actions, and therefore South Carolina procedural law.  South Carolina procedural laws are not applied in federal diversity cases. Erie R.R. v. Tompkins, 304 U.S. 64 (1938).

3.     The Post-Distribution Evidence rule articulated in Branham does not preclude the admissibility of ALL evidence which post-dates the date a product is distributed.

4.     The requirements regarding "other incident" evidence do not require the identical facts in order to be substantially similar.  Otherwise, the party opposing the introduction of the evidence would always be able to point to one thing that may be different than the subject incident.

5.     An expert may rely on other similar incidents as a basis of their opinion even though the facts or data would not be otherwise admissible. Fed. R. Evid. 703.

6.     Defendants are not prejudiced by the disclosure of other incident witnesses because Plaintiff learned of each individual's existence through Defendants' and in most cases Nissan prepared a report based on what the individual relayed to

Nissan.   In other cases, a lawsuit was filed where Nissan had the opportunity to participate in discovery in that action.

## **BACKGROUND**

This case involves claims that the 2000 Nissan Xterra driven by Amanda Middleton was not crashworthy due to a defect in the seat belt system that allowed it to unlatch during the rollover accident which ultimately led to her death.  The Plaintiff's experts opined that, based on physical evidence on the seatbelt and Mrs. Middleton's body, she was wearing her seat belt at the beginning of the rollover.  Craig Good, Ph.D., P.Eng., a mechanical engineer with experience in the design of seat belt buckles and in investigating buckle performance in collisions, opined that the seatbelt buckle released in the rollover because of its propensity to false latch.

False latch is a condition where a seatbelt buckle appears to the occupant to be latched, but it is in fact not fully latched, which in turn can allow it to release due to forces in an accident.   False latch is something the auto manufacturers, buckle manufacturers, and government regulators recognize as a safety issue that must be protected against in the design of the buckle.  One of the recognized potential causes of false latch is the introduction of foreign materials into the buckle such that it interferes with the latching function of the buckle.  Autoliv's design documents recognize that one source of foreign debris is the plastic used to make-up the buckle cover and this can render an occupant not fully restrained.  This condition is considered within the highest of safety risks that must be prevented by design.

A portion of the buckle cover from Mrs. Middleton's seatbelt buckle is broken free.   Dr. Good opined the broken plastic was the likely cause of the false latch

condition that allowed Mrs. Middleton's buckle to release. In support of his opinion, Dr. Good tested the subject buckle to determine the areas that a broken piece of plastic could end up and what effect the broken plastic could have on the latching function of the buckle. Dr. Good demonstrated when a plastic chip from the buckle cover is ingested into the buckle, it can move into a position which prevents the internal lock for the buckle latch from fully engaging.

This "lock for the latch" or lock bar is a safety feature that prevents the latch from moving, thus keeping it fully engaged into the latch plate while the vehicle is being operated and during an accident. When the lock bar is not fully seated on both sides, the buckle in the 2000 Nissan Xterra is in a condition of false latch and will release. Dr. Good's testing demonstrated this to be true. He has also investigated at least two other cases involving the same or substantially similar buckle where he determined the buckle released due to false latch. One of these cases involved a false latch condition caused by a piece of plastic buckle cover from the same location as involved in the Middleton buckle.

During the discovery period in this case, Plaintiff noticed a Fed. R. Civ. P. 30(b)(6) deposition for the Nissan Defendants. One of the items contained in the 30(b)(6) deposition notice was "function, purpose, and useful life of the seatbelt system in the 2000 Xterra." In response to the 30(b)(6) notice, the Nissan Defendants designated Tsutomu Kosuge. The 30(b)(6) deposition of Mr. Kosuge was held on April 26, 2012 in Detroit, Michigan. Mr. Kosuge lives in Japan and currently works for Nissan in the "development of restraint components, which includes seat belt systems, as well

as air bag systems." During Mr. Kosuge's deposition, the following exchange took place

regarding the Nissan's warranty policy of the seatbelt system in the 2000 Xterra:

> Q.    Does – are the seat belt buckles used by Nissan in
> the 2000 Xterra intended to function properly for the
> life of the vehicle?
>
> **A.    According to the Nissan warranty policy, we – the
> seat belts are not supposed to fail and safety
> performance of the seat belt is not to be
> compromised for 20 years**.
>
> Q.    Does that include the plastic buckle cover – let me
> strike that.  Does Nissan intend to that buckle cover
> main its integrity for that 20-year period?
>
> **A.    As I already stated, the requirement is that – that
> there should not be failure that will be an
> equivalent of a compromised safety performance
> or a compromised restraint performance.**
>
> Q.    And that is for a 20-year period?
>
> **A.    Yes.**
>
> Q.    Does Nissan agree that the plastic buckle cover on a
> buckle in the Nissan Xterra should not crack from
> normal use such as insertion of the tongue into the
> buckle?
>
> **A.    If the plastic cover were to crack under normal
> use, that is not a desirable thing to happen.**

(Kosuge Depo. p. 14, l. 16 – p. 15, l. 21 (objections omitted) (emphasis added)).

In addition to a 30(b)(6) deposition of the Nissan Defendants, Plaintiff also

noticed a 30(b)(6) deposition of the Autoliv Defendants. (Autoliv 30(b)(6) Notice).  One

of the items designated in the notice is "[m]aterial properties and specifications for the

plastic used to mold/manufacture the plastic buckle cover on the subject buckle and

similar buckles.  Also, any changes to the material or specifications." (Autoliv 30(b)(6)

Notice).  Autoliv designated Timothy J. Cahill as its 30(b)(6) designee.  At the time of the deposition on February 9, 2012, Mr. Cahill was a principal engineer which in essence pertains to "special projects within the seatbelt development group at Autoliv." (Cahill Depo. p. 8, ll. 3-4).  During the deposition, Mr. Cahill testified regarding the cycle testing of the seatbelt buckles conducted at Autoliv to ensure the seatbelt system and its components comply with the manufacturers' requirements:

> Customers require us to make sure that we have a certain life cycle capability of the buckle and most customers require a 15-year life.  So GM requires, for example, 75,000 cycles. Nissan required 50,000 cycles.
>
> We do that testing on equipment that is not that precise in terms of where it puts the tongue into the buckle.  The air cylinder that controls the travel of the tongue into the buckle will impact certain areas of the buckle until it sees a certain force, and then stop and then latch.  Then you unbuckle the button – or you unbuckle by pushing the button.

(Cahill Depo. p. 33, l. 23 – p. 34, l. 10).

Testimony continued regarding the 15-year life requirement of the seatbelt system and its components:

> Q.   The 15-year life requirement for most of your customers, that applies to all of the components of the buckle, I take it.  That would be for the entire restraint system?
>
> **A.   Right.  When we test something for the cycle life, it has – it's the entire assembly. So, in other words, if we have a fail of any component in there, it's noted and we didn't pass life cycle testing.**

(Cahill Depo. p. 37, ll. 9-17).

> Q.   Just to be sure, the buckle cover, which is molded from plastic, as well as the push button, the design intent is such that those components will also last throughout the life of the buckle?

> **A.     Of course, yeah.**
>
> Q.     And you would agree that these components should not fail through normal foreseeable use throughout the life of the buckle?
>
> **A.     Well, we test to our customer specifications, we test to governmental requirements, and those requirements from our customers and the ones that we impose on ourselves are good measure to ensure that we can provide a good product to the customer that will last for the useful life of the vehicle; so 15 years, 10 years, whatever their requirements are.**
>
> Q.     And this – so the answer to the question is, yes, that the plastic components should last for the – whatever the expected , whether it's 15 years or 10 years, the plastic components should withstand normal use for the life of the vehicle?
>
> **A.     Within the guidelines of normal use, yeah, that's the intent.**

(Cahill Depo. p. 39, l. 7 – p. 40, l. 10 (objections omitted) (emphasis added)).

Another Autoliv employee, John Hyatt, was also deposed on February 9, 2012. Mr. Hyatt is the technical manager in the European seatbelt group for Autoliv. (Hyatt Depo. p. 6, ll. 17-18).  Among other topics, Mr. Hyatt testified regarding the testing and design intent of the seatbelt buckles used in the 2000 Nissan Xterra:

> Q.     And you would agree with me that all the way down to the plastic covers that are on the buckles, that they have to be designed to – in such a manner to remain robust under normal expected operating or use conditions throughout the life of the vehicle.
>
> **A.     Yeah.  The testing that we do for covers would involve temperatures, cycling. I think 90 degrees is one of the temperatures.  They sit for I think it's almost a thousand hours, 960 hours.  There's impact testing.  That's weights dropped on the**

*buckle heads to see if there's any damage. There's a multitude of tests that try to show the robustness of the material.*

Q.    And the material should be designed such that its robust sufficient to not fracture under normal use conditions where a customer's inserting or ejecting the tongue on the seatbelt.

*A.    Yes.*

(Hyatt Depo. p. 18, l. 11 – p. 19, l. 3 (emphasis added)).

## ARGUMENT

## I.    PLAINTIFF'S ALLEGATIONS AND SEPARATE CAUSES OF ACTION REQUIRES IN DEPTH CONSIDERATION OF THE EVIDENCE AT ISSUE.

Plaintiff's Complaint alleges causes of action for negligence (Compl. ¶¶ 15-20), strict liability pursuant to S.C. Code Ann. § 15-73-10, *et seq.*, (Compl. ¶¶ 21-24), and breach of express and implied warranties (Compl. ¶¶ 25-27), against the Nissan Defendants as the manufacturer and distributor of the 2000 Nissan Xterra, and Autoliv, the supplier of the seatbelt buckle.  Each of these causes of action is separate and distinct under South Carolina law. Bragg v. Hi-Ranger, Inc., 319 S.C. 531, 538, 462 S.E.2d 321, 325 (Ct. App. 1995) ("A products liability case may be brought under several theories, including negligence, strict liability, and warranty.").  Each cause of action, standing alone, would be sufficient to warrant recovery if proven. Id. at 539, 462 S.E.2d at 326 ("Strict liability and negligence are not mutually exclusive theories of recovery; that is, an injury may give rise to claims that can be established either under principles of strict liability or negligence, and failure to prove one theory does not preclude proving the other.").

In a negligence action the focus is on the conduct of the manufacturer, whereas under strict liability the focus is solely on the product and whether it is defective and unreasonably dangerous. Id. ("under a negligence theory, the plaintiff bears the additional burden of demonstrating the defendant (seller or manufacturer) failed to exercise due care in some respect, and, unlike strict liability, the focus is on the conduct of the seller or manufacturer, and liability is determined according to fault"); see also Reed v. Tiffin Motor Homes, Inc., 697 F.2d 1192, 1195-96 (4th Cir. 1982) ("Under the theory of strict liability, the exercise of due care by the defendant will not relieve him of liability.").

Section 15-73-10, et seq. provides the cause of action for strict liability, which requires proof of:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer, or to his property, if

   (a) The seller is engaged in the business of selling such a product, and

   (b) It is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in subsection (1) shall apply although

   (a) The seller has exercised all possible care in the preparation and sale of his product, and

   (b) The user or consumer has not bought the product from or entered into any contractual relation with the seller.

S.C. Code Ann. § 15-73-10.

Again, section 15-73-10(2)(a) confirms that the focus in a strict liability cause of action is not on the conduct of the product manufacturer but solely on the product itself.

For over 130 years, South Carolina has held to the principle that a retailer, whether he was ignorant of the defect or conscious of it, is bound to take back the thing or to abate the price, and to make good the damages which the buyers shall have suffered. Smith v. Regina Mfg. Corp., 396 F.2d 826 (4th Cir. 1968). Under South Carolina warranty law, the Plaintiff asserts that Nissan breached both an express warranty and implied warranties of merchantability, habitability, and fitness for particular purpose.

In order to establish a cause of action for breach of express warranty, a plaintiff must prove (1) the existence of an express warranty, (2) breach of an express warranty, and (3) damages proximately caused by the breach. See Cox House Moving, Inc. v. Ford Motor Co., No. 7:06-1218-HMH, 2006 WL 2303182, *4 (D.S.C. 2006) (citing Besse v. Gen. Motors Corp., 317 F.Supp.2d 646, 654 n. 7 (D.S.C.2004)); see also S.C. Code Ann. § 36-2-313. To recover for breach of the implied warranty of merchantability, a plaintiff must prove (1) a merchant sold goods; (2) the goods were not "merchantable" at the time of sale; (3) the plaintiff or his property was injured by such goods; (4) the defect or other condition amounting to a breach of the implied warranty of merchantability proximately caused the injury; and (5) the plaintiff so injured gave timely notice to the seller. Thomas v. La.–Pac. Corp., 246 F.R.D. 505 (D.S.C. 2007).

Plaintiff provides the above analysis as to the separate and distinct causes of action asserted by Plaintiff, the interplay between the different elements of proof required for each one, and the evidence that provides that proof. Throughout the trial,

the Court may deem evidence admissible for one purpose on one cause of action but not admissible for another purpose on another cause of action.  When this is the case, the Federal Rules of Evidence do not prohibit the admissibility of the evidence for all purposes simply because it may be deemed inadmissible for one purpose.  Instead, the Federal Rules of Evidence provide that the evidence may be admitted with a limiting instruction, upon request, that the evidence being offered is solely to be considered for the admissible purpose. Fed. R. Evid. 105.  After all, Rule 102 provides that the "rules should be construed so as to administer every proceeding fairly . . . and to the end of ascertaining the truth and securing a just determination." Fed. R. Evid. 102.  Because there are many potential purposes under the various causes of action that the evidence at issue may be offered, the Plaintiff requests the Court to deny Defendants' Motion without prejudice to raise the objection at trial.  Application of the broad exclusionary rule suggested by the Defendants will be unjust and not in keeping with the Rules of Evidence and trial procedure.

## II.    SOUTH CAROLINA PROCEDURAL LAW DOES NOT APPLY IN FEDERAL COURT

In their motion, Defendants contend that this federal court, sitting in diversity, should apply the "post distribution evidence rule" articulated in Branham v. Ford Motor Co., 390 S.C. 203, 701 S.E.2d 5 (2010).  In a diversity case, generally a federal court will apply the substantive law of the forum state and the procedural rules established for the federal courts by the United States Supreme Court, including the rules of civil procedure and the federal evidence rules.  Erie R.R. v. Tompkins, 304 U.S. 64 (1938).  Ordinarily, questions respecting the admissibility of evidence in this Court would be resolved purely by reference to federal law.  Stroud v. Cook, 931 F.Supp. 733 (D. Nev.

11

1966).  Rules of evidence are at least nominally rules which govern matter of procedure, rather than rules which allocate 'substantive rights.'  Id.  In a diversity case, a state rule of evidence which conflicts an otherwise applicable federal evidence rule will be of no effect whatsoever.  Id.

In the present case, the Defendants are asking this Court to ignore well established case law that requires a federal court sitting in diversity to apply federal law, and instead the Defendants urge the use of the post-distribution evidence rule which is established in Branham.  The evidentiary rule that is articulated in Branham is procedural because it governs the admissibility of evidence in product liability actions and can only be construed as being a procedural rule.  By virtue of the fact that the post distribution evidence rule has the same effect on the admissibility of evidence as the South Carolina Rules of Evidence (SCRE), it should be treated as the equivalent of the SCRE and thus procedural in nature.  Because of the procedural nature of the post-distribution evidence rule it should not be followed by this Court, but rather this Court should follow the federal law controlling the admissibility of evidence.  To date, the federal courts have not adopted a date driven post-distribution rule of evidence similar to what the South Carolina Supreme Court adopted in Branham.  To this end, the Federal Rules of Evidence as currently written should govern the admissibility of evidence in this Court.

III.    **THE POST-DISTRIBUTION EVIDENCE RULE DOES NOT PRECLUDE THE ADMISSIBILITY OF ALL EVIDENCE WHICH POST-DATES THE DATE OF DISTRIBUTION**

Should the Court deem the post-distribution rule articulated in Branham to be substantive, instead of procedural, the rule does not preclude the admissibility of all

evidence which arises after the date a product is distributed.  At this preliminary, motion *in limine* stage, the Defendants contend that any evidence which post-dates April 13, 2000 should be excluded under the post-distribution evidence rule. (Mot. *in Limine* pp. 6-8).  Defendants are asking the Court to rule that any evidence post-dating the date of distribution is inadmissible, without knowing what particular evidence is being offered by Plaintiff, what purpose it is being offered for, and any other arguments as to why the evidence may be admissible.  In essence, if the Plaintiff cannot prove it pre-dates the distribution of the subject vehicle it is per se inadmissible, regardless of any evidentiary rule that permits such evidence to be introduced.  Defendants seek to exclude evidence of other incidents, warranty claims data as to how the product performed in the field, and exemplar buckles from other vehicles that contain a similar fracture to the buckle housing cover in a similar location.  This evidence, Defendants contend, regardless of any relevancy to the issues presented in this case, should all be excluded because there is no evidence these occurred prior to April 13, 2000.

Defendants argument takes the South Carolina Supreme Court's opinion in Branham v. Ford Motor Co., 390 S.C. 203, 701 S.E.2d 5 (2010) to the extreme - anything that occurs after the date a product is distributed is inadmissible as violating the post-distribution evidence rule.  A bright line marking admissibility and non-admissibility is determined simply by the date a product is distributed.  Contrary to Defendants' "bright line" rule that anything post-dating the distribution of the product is inadmissible, the majority opinion in Branham does not go as far as Defendants contend. Justice Kittredge writing for the majority noted the following regarding post-distribution evidence:

When assessing liability in a design defect claim against a manufacturer, the judgment and ultimate decision of the manufacturer must be evaluated based on what was known or "reasonably attainable" at the time of manufacture.[17] *See* Restatement (Third) of Torts: Products Liability § 2, cmt. a. (1998). ***The use of post-distribution evidence to evaluate a product's design through the lens of hindsight is improper***.

Id., at 227, 701 S.E.2d at 17-18. (emphasis added).

In dissent, Justice Pleicones opined that:

I note at the outset that the majority opinion may be read as barring any evidence *created* after the date of manufacture. If this is the majority's view, I strongly disagree. In my view, such a rule would deprive the fact finder of relevant evidence regarding what the manufacturer knew or should have known, design alternatives, and the risk inherent in the manufacturer's design.

Id., at 245, 701 S.E.2d 27 (Pleicones, J. dissenting).  To clarify the extent and breadth of the post-distribution evidence rule, the majority added a footnote clarifying that not all evidence post-dating distribution is inadmissible.  "The dissent asserts that our opinion 'may be read as barring any evidence created after the date of manufacture.' We do not intend our holding to reach that far." Id., at 227, 701 S.E.2d at 18 n. 17.

Based on the South Carolina Supreme Court's majority opinion, the post-distribution evidence rule does not extend to bar all evidence which post-dates a products distribution.  Plaintiff submits that the majority opinion in Branham is limited solely to evaluating a product's design. Id. ("The use of post-distribution evidence to ***evaluate a product's design through*** the lens of hindsight is improper.") (emphasis added).  Therefore, it has no application to a negligence action where the focus is on the conduct of the manufacturer or a breach of warranty action.

An example illustrates that the rule should not preclude the admissibility of all evidence which post-dates the product's distribution.  Assume a manufacturer releases

14

a product that it believes to have a flawed design, but decides to release the product anyway.  The product is released for sale to the public and shortly thereafter starts failing.  The failures seriously injure and/or kill the occupants of the vehicles.  The manufacturer with knowledge of this defect decides not recall the product or advise consumers regarding potential safety hazards.  Moreover, an admission written after the date the product was distributed about the manufacturer's knowledge of the product's flawed design prior to release of the product would be inadmissible as violating the post-distribution evidence rule.  This example highlights that the South Carolina Supreme Court did not intend the exclusion of post-distribution evidence to apply to negligence and breach of warranty causes of action.

The case of Jackson v. Firestone Tire & Rubber Co., 788 F.2d 1070 (5th Cir. 1986) illustrates the unreasonableness of a blanket exclusion of post-distribution evidence as Defendants urge here.  The Fifth Circuit Court of Appeals rejected the very rule adopted by the Court regarding post-distribution evidence.  In Jackson, the plaintiff brought a design defect claim – strict liability and negligence – against manufacturers of component wheel parts for injuries he sustained when a vehicle's tire exploded.[1]  At trial, the plaintiff sought to introduce documents generated after the date of manufacture, but the trial court ruled all documents post-dating manufacture were "automatically excluded."  Id. at 1084.  Prior to addressing the trial court's exclusion of post-manufacture evidence, the court began its analysis by noting the differences between a negligence theory and strict liability theory.  Under a negligence theory a

---

[1]    Jackson was standing "three to five feet away from the tire assembly" when it exploded. Id. at 1072.

party is held accountable on the basis of knowledge, while under a strict liability theory "the *dangerousness* of a product may be proved as of any time prior to trial." Id. at 1084 (emphasis in original). In reversing the trial court's decision to exclude all post-manufacture evidence, the Fifth Circuit noted "[t]his wholesale, blanket exclusion of evidence led to some obviously artificial and unreasonable results." Id. "To exclude other documents obviously referring to or reporting on that long history [of a product] simply because they happen to be dated a few months after manufacture of a component litigated in this case is to give undue and artificial significance to an essentially arbitrary line of demarcation." Id. at 1085.

A bright line rule excluding any evidence which post-dates the vehicles distribution would exclude evidence traditionally treated as relevant and tending to prove issues in the case.

Defendants also seek to exclude warranty claims data since they were created after April 13, 2000, regardless of the purpose the evidence is offered. The South Carolina Supreme Court in Laffitte v. Bridgestone Corp., 381 S.C. 460, 674 S.E.2d 154 (2009) stated that evidence of the performance of the product in the field may be proof of defect. In Laffitte, a design defect tire case, the Court reviewed a discovery order compelling Bridgestone Corporation to turn over its steel belt skim stock formula, classified as a trade secret, to the plaintiff. The Court found that the plaintiff had not shown that knowledge of Bridgestone's trade secret was necessary in order for the plaintiff to prove the tire was defective as designed. The Court reversed the trial court's order compelling disclosure of the skim stock formula. The Laffitte majority, in concluding that the plaintiff had failed to show the requisite need for the trade secret,

16

relied heavily on the "availability of reasonable alternatives to the discovery of the trade

secret." Id. at 479. The tire at issue "was manufactured in 1996 at Bridgestone's Hofu

Plant in Japan." Id. at 465. One of the "reasonable alternatives" the Court posited

would be disallowed under a strict application of the "post-distribution" exclusionary rule:

> Specifically, a chemical analysis necessitating the discovery
> of Bridgestone's skim stock formula *is not the sole, or even
> the best, way to test for defects*. We find an October 2001
> report issued by the National Highway Traffic Safety
> Administration (NHTSA) particularly instructive to the Court
> in this regard.
>
> The stated purpose of the federal investigation documented
> in this report was to determine whether Firestone's August
> 2000 recall of Wilderness AT tires was adequate in scope.
> The report focused on non-recalled tires that were
> manufactured primarily as original equipment for Ford
> Explorers, yet were similar to the tires recalled by Firestone
> in 2000. The study used peer tires, in order to compare
> performance results to the Wilderness AT tires being
> evaluated.
>
> The methods of the federal recall investigation, employed on
> both Firestone tires and the peer tires, included "thorough
> analyses of available data regarding the performance of tires
> in the field…"

Id., 381 S.C. 460, 464, 674 S.E.2d 154, 156-157 (2009) (emphasis added). Like

the deadly tire in Lafitte, it was only after many accidents and deaths that the design

defect was discovered and recalled. Under a strict application of the post-distribution

evidence rule, consideration of the same evidence the South Carolina Supreme Court

pointed to in support of its refusal to allow access to admittedly relevant evidence would

be foreclosed from jury consideration.

Statements made by an opposing party are admissible under the Federal Rules

of Evidence regardless of whether the admission post-dates the product's distribution as

it is an acknowledgment by the manufacturer. Fed. R. Evid. 801(d)(2). In Jackson, supra, the Fifth Circuit Court of Appeals acknowledged that most of the post-manufacture documents excluded by the trial court were admissible as admissions. The Court stated: "And most of them [post-manufacture documents] should be admissible as admissions because employees . . . prepared them while acting within the scope of employment." Jackson, 788 F.2d at 1084. Under Rule Fed. R. Evid. 801(d)(2), statements made by an opposing party are admissible regardless of when the admission is made.

Lastly, post-distribution evidence would be admissible for impeachment purposes. For example, it is axiomatic that Nissan or Autoliv be allowed to exclude all evidence which post-dates the product's distribution then contend at trial that it is not aware of another vehicle with this defect (chip to the buckle housing cover), or any other individual that has experienced a false latch. Plaintiff would be entitled to impeach that position with the various pictures or exemplar buckles produced in this case from Nissan or Autoliv which depict or contain a chip to the buckle housing cover in other Nissan vehicles with the same or similar Autoliv buckle.

The exemplar buckles referenced in Defendants' Motion are from other vehicles which contain the same or similar Autoliv buckle. Most contain a similar chip to the buckle housing cover as the buckle in Mrs. Middleton's vehicle. Defendants contend these exemplar buckles are inadmissible because "there is no evidence that any alleged defect occurred prior to April 13, 2000." (Motion *in Limine* p. 8). However, these buckles are relevant to Plaintiff's claim for breach of warranty since Nissan and Autoliv's representatives testified regarding the warranty period and life requirement of the

buckle.  Other failures during that period would be admissible to show other buckles have experienced similar failures within the warranty period or life requirement of the buckle. The presence of broken buckle covers that exhibit almost identical failures as the subject buckle makes it more probable that the plastic covers are failing under normal use conditions rather than through abuse.    Defendants' Motion *in Limine* to exclude all evidence which post-dates the subject Xterra's distribution should be denied.

## IV.    OTHER INCIDENTS DO NOT HAVE TO BE IDENTICAL TO SATISFY THE SIMILARITY REQUIREMENT

Defendants also contend that other incidents are inadmissible as Plaintiff cannot show that any other incident occurred prior to April 13, 2000.  Secondly, even if Plaintiff can show the incident occurred prior to April 13, 2000, Plaintiff "cannot establish that any of the incidents are 'substantially similar' to the unique events alleged to have occurred in the Middleton accident." (Motion *in Limine* p. 8).  Again, Plaintiff contends that any ruling on the admissibility of other incidents is pre-mature at this juncture as it is important to assess what the witness is testifying to, what purpose the evidence is being offered for, and whether it is admissible under the Federal Rules of Evidence.  Instead, Defendants seek a blanket exclusion of all other incidents involving the same or similar vehicles and/or same or similar seat belt buckles.

Even if it is not pre-mature to rule on the admissibility of these other incidents, it has long been established in South Carolina that evidence of similar acts is admissible where there is some special relation between them which would tend to prove or disprove some fact in dispute. See JKT Company, Inc. v. Hardwick, 274 S.C. 413, 265 S.E.2d 510 (1980).  "It is simply a rule of relevance, logic, and common sense." Reed v. Clark, 277 S.C. 310, 286 S.E.2d 384 (1982) (citing Brewer v. Morris, 269 S.C. 607, 239

S.E.2d 318 (1977)).    The exclusion of relevant similar incidents has been called "manifest injustice."    Barnes v. Jones Chevrolet Co., Inc., 292 S.C. 607, 612-13, 358 S.E.2d 156, 159 (Ct. App. 1987).

Professor David Owen has described when other accidents are relevant in products liability cases:

> Other accident evidence may be relevant to any of the following three factual matters commonly disputed in product liability litigation:  (1) the nature and extent of a product's dangerous condition, (2) the defendant's awareness of that condition, and (3) the causal relationship between the condition and the plaintiff's harm.   Assume, for example that a driver is injured in a rollover of a sport utility vehicle ("SUV").  Each of these three matters might be controverted, for example, in an action against the SUV's manufacturer for injuries in a rollover that occurred during a particular steering maneuver on a particular grade at a particular speed. Evidence of one hundred accidents involving the same model SUV under similar circumstances might tend to show all three facts:  ***(1) that this model SUV is especially prone to rolling over under these particular conditions; (2) that the manufacturer was informed of this danger because of the large number of similar accidents; and (3) that certain aspects of the vehicle's design*** (and perhaps the absence of adequate warnings and instructions) may have contributed to the accidents.   In short, other-accident evidence may be probative of a product's dangerous condition, notice to the manufacturer of the condition, or causation linking the condition to the accident.   Moreover, because punitive damages may be based upon a defendant's failure to address a serious hazard of which it is aware, evidence of other similar accidents may be relevant to this issue as well.

David G. Owen, *Proof of Product Defect*, 93 KY. L.J. 377 (2005) (emphasis added).

A number of other courts have allowed evidence of other similar accidents that occurred after the defective product was sold or involved in the consumer's accident.[2] "These courts reason that the probative force of such evidence for demonstrating defectiveness or a product's dangerous condition in no way depends on when the other accident occurred." Id. at 27.

Defendants urge the Court to adopt a strict test with regard to other incidents – if Plaintiff cannot prove the identical facts, causes, etc. – then the incident is not admissible. If this was the requirement, Defendants would always be able to point to some aspect of the other incident – occupant weight, weather at the time of the accident, grade of the highway, concrete vs. asphalt, truck compared to SUV – which they would contend makes the other incidents inadmissible. In this case, evidence of other incidents is relevant to a product's dangerous propensities and other times the Defendants have had similar problems as Plaintiff asserts here.

Additionally, pursuant to Fed. R. Evid. 703, an expert may rely on evidence which is otherwise inadmissible if experts in the field typically rely on those kinds of facts.

## V.     DEFENDANTS' MOTION TO STRIKE WITNESSES IDENTIFIED BY PLAINTIFF SHOULD BE DENIED AS PLAINTIFF LEARNED OF THE EXISTENCE OF THESE WITNESSES THROUGH NISSAN'S DISCOVERY RESPONSES

In their motion, Defendants suggest that Plaintiff's listing of Nissan's customers as potential witnesses have been sprung upon them and therefore these witnesses

---

[2]     See, e.g., Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1248 (10th Cir. 2000) (applying N.M. law); Carballo-Rodriguez v. Clark Equip. Co., 147 F.Supp.2d 66, 73 (D.P.R. 2001); Simon v. Coppola, 876 P.2d 10, 14 (Colo. Ct. App. 1993); Preston v. Mont. Eighteenth Jud. Dist. Ct., 936 P.2d 814, 820 (Mont. 1997); Robinson v. G.G.C., Inc., 808 P.2d 522, 525 (Nev. 1991); Slyke v. Sunterra Corp., No. 183382, 2001 WL 543419, at *1 (Va. Cir. Ct. Mar. 21, 2001).

should not be allowed to testify. This argument is disingenuous, at best, considering the Plaintiff learned about the Nissan customers through documents provided by Nissan. **(Exhibit 1).** It was only after this Court issued an order compelling discovery that Nissan provided the identity of these individuals to the Plaintiff. ECF Docket Entry # 92.

The attached "incident investigation report" is indicative of the type of report Nissan prepares when they become aware of a wreck involving a Nissan vehicle. The Defendants are not only aware of these potential witnesses but they have sent a representative out to meet with each of these individuals and prepare reports identical to Exhibit 1. Most, if not all, of the Nissan customers listed by Plaintiff contain a report similar to Exhibit 1 from Nissan. Contrary to Defendant's suggestion of trial by ambush or "releasing a warren of rabbits" into the courtroom, Nissan has been fully aware of these witnesses far longer than the Plaintiff, and Defendants have already investigated these claims and interviewed these witnesses. To the extent that they wanted to depose any of the Nissan customers, the Nissan Defendants have known of these individuals and the specifics of their complaints long before this lawsuit was filed. In several cases, the customer filed a lawsuit where Nissan participated in discovery.

The formal listing of the names of Nissan's customers from Nissan's discovery production did not magically divest Nissan of its knowledge of its customers nor did it cause any prejudice to the Defendants to support striking of these individuals as potential witnesses. To be sure, the Defendants have made no effort to depose the initial ten customers listed by the Plaintiff in early January other than to attend the two depositions noticed by the Plaintiff. Likewise, given that the Defendants have taken far in excess of the allowable ten depositions under Fed. R. Civ. P. 30, there has been no

motion to take additional depositions.  The lack of action with regard to these known witnesses evidences that the Defendants do not need to or intend to depose any of these witnesses and thus have suffered no prejudice by the timing of the formal listing of the Nissan customers.  It is also worth noting that Defendants claim prejudice by not being allowed depose these witnesses to learn the substance testimony.  At the same time, however, Defendants know enough about these witnesses' testimony to agree their incidents are not substantially similar to the one involved in this case to argue for a blanket exclusion of "other incident" evidence.  The Defendants have shown no prejudice to warrant striking the witnesses and accordingly the motion should be denied.

## CONCLUSION

Plaintiff requests the Court delay ruling on Defendants' Motion *in Limine* until the evidence is offered to afford the Plaintiff an opportunity to call the witness and the Court an opportunity to rule on its admissibility based on the purpose the evidence is offered. Defendants' Motion as to the post-distribution evidence and other incidents should be denied as the rule announced in <u>Branham</u> does not preclude the admissibility of all evidence dated after the product's distribution.  Finally, Defendants' Motion to Strike the Witnesses should be denied as Plaintiff learned of these witnesses from Defendants and Defendants know enough about these witnesses testimony to argue their incidents are not substantially similar to this one.

*[SIGNATURE PAGE TO FOLLOW]*

David Yarborough, Esq.
Fed ID #7336
david@yarboroughapplegate.com
William Applegate, Esq.
Fed ID #9261
YARBOROUGH APPLEGATE, LLC
PO Box 20398
Charleston, SC 29413
(843) 972-0150: Phone


~and~


PETERS, MURDAUGH, PARKER, ELTZROTH
& DETRICK, P.A.


BY:  /s/ Ronnie L. Crosby
Ronnie L. Crosby
Fed ID #6311
rcrosby@pmped.com
William F. Barnes, III
Fed ID #10639
wbarnes@pmped.com
PO Box 457
101 Mulberry Street East
Hampton, SC 29924
(803) 943-2111: Phone
(803) 943-3943: Fax
**ATTORNEYS FOR PLAINTIFF**


March  18 , 2013
Hampton, South Carolina