IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| KENT H. MIDDLETON, JR., as Personal representative of The Estate of Amanda Middleton, <br><br> Plaintiff, <br><br> v. <br><br> NISSAN MOTOR COMPANY, LTD., NISSAN NORTH AMERICA, INC., AUTOLIV, INC. and AUTOLIV ASP, INC., <br><br> Defendants. | Civil Action No.: 7:10-02529-MGL <br><br> **Defendants' Reply to Plaintiff's Response to Defendants' Motion for Leave of Court to Continue the Deposition of Plaintiff's Expert Craig Good** |

## I.    <u>Introduction</u>

Plaintiff's response demonstrates a fundamental misunderstanding of the Federal Rules of Evidence and this Court's gatekeeping role as mandated by the US Supreme Court in <u>Daubert v. Merrell Dow Pharm, Inc</u>., 509 U.S. 579 (1993). This gatekeeping role — to ensure the reliability and relevancy of expert testimony — requires that the trial judge make a preliminary assessment of whether or not the reasoning or methodology underlying the proposed expert testimony is scientifically valid and whether it can be applied to the facts in issue. <u>Daubert</u>, 509 U.S. at 592–93. Plaintiff asks this Court to give Dr. Good a "pass" to circumvent the mandatory review under Rule 702. To allow Dr. Good to present new and novel opinions and bases for these opinions from his Rebuttal Report, without Dr. Good's reasoning and methodology ever being subjected to cross examination or deposition scrutiny prior to trial would be

1

directly contrary to the Supreme Court's ruling in Daubert and Rule 702 and unfairly prejudicial to Defendants.

Though Plaintiff is correct that the purpose of Defendants' seeking leave to depose Dr. Good is to expose the fatal gaps and unsupported leaps of faith that he makes in his reasoning and thus, the inadmissibility of his testimony, the purpose has nothing to do with "sound bites." Defendants' purpose is to provide this Court with the proper basis to make an informed decision regarding the admissibility or not of Dr. Good's opinions pursuant to Rule 702 and Daubert. Defendants are entitled to examine Dr. Good *prior to trial* to fully understand his new work and opinions and to demonstrate the inadequacies in the methodology and reliability of that new work to support his opinions so that this Court can make an informed evaluation as to the admissibility of his anticipated testimony. See Daubert, 509 U.S. 579, 594-95 (1993).

It is not surprising that Plaintiff seeks to avoid Dr. Good's deposition because the defect and causation theories proffered depend upon extreme, even contradictory, machinations to get this buckle to release. A deposition's scrutiny will reveal the truth behind the curtain – that Dr. Good's novel false latch theory consists of a series of remotely possible buckle forces and movements stacked one on top of another that cannot happen in the real world of Newtonian physics. To deny Defendants the opportunity to expose the holes in this theory would unfairly prejudice not only Defendants, but also this Court because it will significantly hinder Defendants' ability to demonstrate both the unreliability of Dr. Good's analysis and the complete failure to have a scientific connection between his contrived laboratory work and any forces that might have occurred in a rollover crash, and more specifically, in this crash.

Dr. Good's opinions in a seatbelt release case were recently excluded as scientifically unreliable for these very reasons. In <u>Hoffman v. Ford Motor Co.</u>, 493 Fed. Appx. 962 (10th. Cir. 2012), attached as Exhibit 1, the Tenth Circuit Court of Appeals concluded that the admission of Dr. Good's seatbelt defect theories was error, resulting in the reversal of an $18,030,000 verdict and entry of judgment for Ford. The Tenth Circuit concluded that "Good failed to present a **scientific connection** between the accelerations he found necessary to inertially unlatch buckles tested in the laboratory and accelerations that occurred or could have occurred in [Hoffman's] buckle during the rollover. As a result, his opinion (that [Hoffman's] buckle was defective because it inertially unlatched during the accident) should not have been admitted at trial." <u>Hoffman</u>, 493 Fed. Appx. at 964 (emphasis added). Ford argued, and the Tenth Circuit Court of Appeals agreed, that Dr. Good failed to determine whether the levels of acceleration necessary to cause the buckle to unlatch in the laboratory occurred or could have occurred in the Hoffman rollover accident. See <u>Hoffman</u>, 493 Fed. Appx. at 964-65 ("At trial, Good changed the rationale for his opinion from that contained in his pre-trial filings. But even then he failed to make the **critical connection between lab tests and real world events, a necessary ingredient to establish causation**." (emphasis added)).

A deposition here will reveal whether Dr. Good has made the critical connection in this case between his lab tests and real world events. His supplemental report gives no detail regarding this connection. To date, Dr. Good has not produced any empirical evidence or calculations showing that the plastic chip fragment utilized by Dr. Good in his tests did or could have migrated into the latching mechanism of the buckle causing it

3

to jam in *this* accident. Similarly, Dr. Good has not produced any empirical evidence or calculations showing that the triaxial and virtually simultaneous forces that Dr. Good opines in his Rebuttal Report (and shows in his videotaped demonstrations) are needed to release the buckle occurred or could have occurred in *this* accident.

## II.     Defendants Have Not Waived The Right To Request The Deposition of Dr. Good.

In an attempt to deflect the Court's attention from the real issue, Plaintiff constructs a bizarre straw-man that Defendants have somehow "waived" their right to depose Dr. Good. This argument, repeated throughout Plaintiff's brief and comprising the majority of Plaintiff's response, is not based upon the facts. It depends instead upon Plaintiff's inaccurate assertion that Defendants are seeking a continued deposition of Dr. Good to question him regarding the testing produced at his May 2012 deposition. Plaintiff is responding to a motion that was not filed.

As the motion clearly states, "Defendants now seek additional time to examine Plaintiff's seatbelt expert Dr. Good regarding his January 29, 2013 Rebuttal Report and the testing and information Dr. Good considered and/or relied upon in his analysis." **ECF 112** at 1, 10. Granted, this deposition may touch upon Dr. Good's prior work to the extent he relies upon it as the basis for his new testing. However, it appears that Dr. Good has abandoned much of his earlier work, including at least one of his defect theories. The initial report has been replaced essentially with the new analysis and opinions in the Rebuttal Report, demonstrating the need to further depose Dr. Good.

Plaintiff's waiver argument is especially perplexing because Plaintiff's counsel previously agreed to a second deposition to inquire about Dr. Good's new report and accompanying materials. As recounted in Defendants' Motion, rather than moving to

4

strike the January 29 report and materials as late, Defendants obtained Plaintiff's consent to seek an additional 60 days of discovery from the Court "to allow for sufficient time to evaluate the Rebuttal Report and supporting materials, <u>to depose Dr. Good,</u> and to serve any rebuttal work… and to allow for the depositions of additional fact witnesses recently identified." **ECF 109** (emphasis added). This Court granted the motion. **ECF 110**. Now, for the first time, Plaintiff asserts that Defendants somehow waived any request for a second deposition and that he "does not stipulate to an additional deposition of Dr. Good." **ECF 115** at 2. Plaintiff should not be allowed to evade a motion to strike a late Rebuttal Report by agreeing to a second deposition only to later impose unreasonable conditions on that deposition, and then to object to it completely.

### III.     <u>The Discovery Sought Is Appropriate and Necessary Under Rule 26</u>

The discovery sought is not unreasonably cumulative or duplicative. Obviously, Defendants had no opportunity to discuss the information disclosed on January 29, 2013 during his May 30, 2012 deposition. Plaintiff's suggestion that the January 29 Report contains no new information and that Defendants should have just asked better questions during the May 30 deposition is illogical. If the Report contains nothing new or necessary to Dr. Good's previously stated opinions, why was the Report written, the testing done, the photographs taken, and the analysis undertaken and produced to Defendants? Of course, the Report contains new opinions and new reasoning and analysis upon which those opinions are based. Rule 702 and the discovery rules allow Defendants to depose Dr. Good regarding this newly disclosed work.

The benefit of the proposed deposition greatly outweighs its expense. The opinions, analysis, and reasoning contained in Dr. Good's supplemental report and the

accompanying documentation form the foundation of Plaintiff's claims. The technical conclusions provided in the Rebuttal Report essentially replace those in Dr. Good's initial report. Defendants are entitled to discovery regarding all the new work produced. It is not just the information provided in the Report and accompanying materials, but the methodology Dr. Good employed and did not employ, and the absence of information that also must be explored via deposition. Defendants are entitled to explore the methodology employed by Dr. Good in his new work, and to question him about what that work proves and does not prove; and to confirm what Defendants believe Dr. Good did not do and does not have to support his theories. The testimony elicited from Dr. Good's deposition on this subject will likely form the basis of Defendants' dispositive motion, or Defendants will be proven wrong and it will not. Either way, the information sought is discoverable under the Rules that were created, in large part, to prevent trial by ambush.

### A.     Dr. Good's Testing Is Discoverable

Plaintiff's assertion that Dr. Good's videotape testing should not be subject to deposition is directly contrary to the practice and procedure in the District Court of South Carolina and the Federal Rules of Procedure and Evidence. The videotapes, which Defendants are providing to the Court, must be seen to appreciate how unreasonable this position is. See videotapes attached as Exhibit 2. In his deposition, Dr. Good described the unlatching as follows:

> Q: Well, have you pulled the tongue out when the one side of the lock bar is engaged in the L-slot?
>
> A: Yeah, the – you can – you can – you can – if you give that – such as in a rollover, if you push that buckle – if you push that buckle in and pull it out, it comes out right away.

6

* * * *

    Q:    What's your basis for that opinion?

    A:    If you push the tongue in and pull it out, it comes out.

Good dep 76:4-10; 77:2-10, attached as Exhibit 3. The videotapes disclosed on January 29 purport to demonstrate the above described two motion action (push/pull). Dr. Good's actions on the tapes, however, differ greatly from that described in his testimony. Exhibit 2, Tests 1, 2, 4, 5, 6, 7. He admits this in his Rebuttal Report, wherein he now describes three motions, not two (push, bend and pull).

    As the Court will observe, Dr. Good is not simply pushing the latch plate in and then pulling it out as he described in his May deposition. Rather, he is demonstrating his new buckle release theory as described in his Rebuttal Report. He now opines that the false latch occurs when "the tongue [i]s pushed in to the limit of tongue over-travel (inwards) and then pulled out while applying a **concurrent moment**" or bending. 1/29/2013 Rpt., attached as Exhibit 4, at 2 (emphasis added). Dr. Good further opines, for the first time, that "tongue over-travel can occur in a rollover as a result of inertial loading of the tongue and/or direct occupant contact with the buckle. The concurrent moment can be applied by webbing tension directed outboard and/or direct occupant contact." Ex. 4 at 4. This is the first mention of this critical connection needed to meet Rule 702 requirements. This conclusory statement without more, however, does not meet the Daubert test for scientific reliability and relevance. See Hoffman, 493 Fed. Appx. at 964-65.

    In his demonstrations, to release the latch plate tongue (after the fragment and lock bar have been manipulated into position off-camera), Dr. Good firmly grasps the

7

latch plate with his hand, pushes the latch plate in, and then while the latch plate is still pushed in, he bends the latch plate away from the press button. Finally, he maintains this bending while simultaneously pulling the latch plate upward. Moreover, contrary to his claim in his deposition, Dr. Good does not pull the latch plate out of the buckle through webbing tension, despite repeated attempts. Rather, Dr. Good has to grab the latch plate with his hand and bend the latch plate as he pulls the latch plate from the buckle. Notably, in his videos, there are many failed attempts to release the latch plate. Dr. Good often has to make several attempts before he is able to release the latch plate in this way. The demonstration is significantly different from the description provided by Dr. Good in his May deposition for how this false latching occurred.

Defendants' request to depose Dr. Good in person regarding the videotapes is reasonable. Defendants need to see Dr. Good, not just in a two dimensional video shot from limited angles, but in person so that they can question him regarding, among other things, the magnitude, duration, and direction of the forces he is exerting on this latch plate during each part of the buckle sequence. Absent this discovery, neither Defendants nor this Court can determine whether Dr. Good can establish the requisite link between his lab tests and this real world crash.

Defendants are also entitled to see and videotape Dr. Good's off-camera work. Dr. Good claims in his Rebuttal Report that "the tests documented [] demonstrate that the subject buckle is subject to partial engagement and can release with an ingested fracture fragment even after more than 20 lb is applied to the tongue." Ex. 4, p. 3. However, despite producing 10 videotapes and numerous photographs, critical aspects of the testing protocol intentionally are not documented. Dr. Good does not document

the process he uses to position the fragment in the latching mechanism of the buckle. Neither does Dr. Good document how he manipulated the lock bar such that it is seated diagonally in the L slot. Finally, Dr. Good failed to document his insertion of the latch plate into the buckle. Rather, this manipulation all occurs off-camera. Dr. Good's videotape "evidence" of the alleged false latch begins about half way through the testing process. The process used by Dr. Good to position the chip into the latching mechanism is clearly discoverable. If it can be repeated, it can be documented in a video deposition. If it cannot be repeated on camera, it is likely not scientific.

     Dr. Good seeks to pre-empt the inevitable criticism that he manipulated the buckle latching mechanism and positioned the chip off-camera by asserting that he manually placed the fragment in a location "where previous ingestion testing demonstrated fragments migrate on tongue insertion." Ex. 4, p. 2. However, Defendants are not aware of any testing done by Dr. Good that demonstrate that fragments "migrate" to the location identified when broken off during tongue insertion. In his previous work, Dr. Good dropped fragments in the mouth of the buckle and then inserted the tongue.   At no time has he disclosed any documentation demonstrating the movement or resting place of any fragment on tongue insertion. Defendants need to depose Dr. Good regarding this assertion and the basis, if any, for it.

     Similarly, Dr. Good indicates in his Rebuttal Report that "[p]revious testing indicated that the most common location for a fragment was jammed in the mechanism between the ejector/tongue and the latch." Ex. 4, p. 2. In the only previously disclosed testing, Dr. Good testified that he dropped a plastic chip into the buckle mechanism "hundreds of times" and, after inserting the buckle tongue, observed only six incidents

9

of the fragment jammed between the ejector/tongue and the latch. Ex. 3, 57:21-58:9, 101:9-102:7; Exhibit 9 to Dr. Good's deposition attached as Exhibit 5. Dr. Good further testified regarding the movement of the chip when dropped into the buckle:

> It's – it's the – the movement of that chip in the – inside the buckle mechanism is – is – is **random**. **It – it bounces all over the place** when – when you let it in, drop it in. **So each time you drop it in it goes to a slightly different place**. So yes, so it you – if you drop it in, it – it's gonna go to a place. Now, if it breaks off, it's also gonna bounce around in there and likely could end up in -- in a similar position.

Ex. 3, 93:17-94:6 (emphasis added). Six times out of "hundreds" of times is not a "most common location." Therefore, Defendants seek leave to depose Dr. Good to question him about the basis for this statement in his Rebuttal Report.

### B.     Dr. Good's New Buckle Release Theory Is Discoverable

Fundamental fairness dictates that Defendants be given the opportunity to conduct deposition discovery into the novel assertion in Dr. Good's rebuttal report that in the subject accident, the tongue is pushed into the buckle either by "inertial loading … and/or direct occupant contact with the buckle. The concurrent moment can be applied by webbing tension directed outboard and/or direct occupant loading." Ex. 4, p. 4. Plaintiff's protests to the contrary, this statement represents a new opinion as to how Mrs. Middleton's buckle allegedly unlatched during this rollover event.

In his initial report and deposition, Plaintiff's expert Dr. Good posited two different theories to explain how the subject buckle may have "false latched." Dr. Good produced photographs and videotaped demonstrations of two alternative theories of chip-caused buckle release, a/k/a the "F position" and the "P position." According to Dr. Good, the subject buckle could false latch when the lock bar was seated horizontally in the L slot (the F position), or when the lock bar was seated diagonally in the L slot (the P

10

position). Dr. Good's newly disclosed testing appears to disprove his F position theory. Defendants need to depose Dr. Good to confirm that this false latch theory has been abandoned.

As for the P position theory, Defendants do not dispute that Dr. Good espoused a "push-pull" notion in his deposition, to explain how the buckle could allegedly release from the P position. The opinion now provided in the Rebuttal Report, however, is very different than that Dr. Good describes in his deposition. In his new disclosures, he appears to offer the exclusive opinion that the lock bar was seated diagonally at the time of the accident (the P position). He then opines for the first time that the buckle could have released as a result of inertial loading and/or occupant contact accompanied by a "moment," or bending, of the latch plate back towards the seat that must occur concurrently for release.

As noted *supra*, neither of Dr. Good's buckle release mechanisms – inertial loading or occupant contact – were disclosed in his first report or during his first deposition. Dr. Good also failed to explain that to release, the latch plate must be pulled not just upwards, but also downward toward the seat cushion in a bending motion. Contrary to Plaintiff's assertions, Defendants asked numerous questions during Dr. Good's deposition that invited these explanations, but Dr. Good did not give them. Either Dr. Good was being evasive, or at the time of the deposition he did not hold these new opinions. Ex. 3, 76:4-11, 77:2-4, 259:12-24, 260:15-262:12. Rather, Dr. Good testified that the buckle would release from the P position "if you push the tongue and then pull it out, without touching the button, it will come out." Ex. 3, 260:15-19. He also affirmatively testified that he was not rendering an opinion that the subject buckle was

11

inertially unlatched in this crash, or that it was unintentionally actuated by Ms. Middleton. Ex. 3, 170:7-171:1. Dr. Good testified that he had not done any analysis of Ms. Middleton's movements inside the vehicle in the crash, and that he was not offering any occupant kinematics opinions. Ex. 3, 208:21-209:4. His new report explicitly contradicts this testimony.

Defendants should be allowed to depose Dr. Good regarding the apparent inconsistencies between his May testimony and the work recently disclosed. Defendants need to learn what Dr. Good's final opinions are and the basis for each. It is not clear what opinions and reasoning Dr. Good has abandoned, and what evidence he intends to present at trial. Dr. Good's new theories of how the alleged release occurred are not trivial. They are critical components of Plaintiff's defect theory that Dr. Good must demonstrate – the scientific connection between his lab manipulations of the buckle and what happened *in this accident.* It was the absence of this critical link that the Tenth Circuit determined was fatal to Dr. Good's opinions in Hoffman. Plaintiff's attempt to obstruct Defendant's discovery of Dr. Good's opinions and the basis for these opinions is contrary to the dictates of Rule 26 and his earlier agreement to produce Dr. Good for questioning.

### C.     Dr. Good's Opinions Regarding *Tkachuk v. Mazda* Is Discoverable.

Defendants did not indicate that the Mazda Protégé collision was previously undisclosed in this case. To the contrary, in response to Defendants' questioning, Dr. Good opined in his May deposition that the Tkachuk incident was substantially similar to the Middleton matter. However, he produced no documentation or data to support that

12

opinion.[1] Defendants recognize that Plaintiff agrees that the unlatching theory in the Mazda case was different from the one alleged in this case, and that Dr. Good is not offering a new opinion regarding the unlatching in this matter. However, that was not clear in Dr. Good's Rebuttal Report.

Discovery into Dr. Good's opinions regarding the Mazda matter and the bases for those opinions is still necessary, however. Based upon counsel's representation that the alleged false latch mechanism in the Mazda case is different from the false latch mechanism alleged in this case, Defendants seek to depose Dr. Good regarding what relevance he now contends the Mazda matter has to this case and the basis for his opinion, if he still holds it, that the two matters are substantially similar. Defendants are entitled to discovery into the basis for Dr. Good's substantially similar opinion and the documentation disclosed for the first time in his Rebuttal Report. Complete pre-trial discovery into substantially similar incidents is very important as the South Carolina Supreme Court has recently acknowledged the risk for unfair prejudice resulting from the improper admission of such alleged events. Branham v. Ford Motor Co., 390 S.C. 203, 229, 701 S.E.2d 5, 19 (2010). If, of course, Plaintiff agrees that the Mazda case is not admissible or a basis for Dr. Good's opinions, there will be no need for the inquiry.

---

[1] Plaintiff makes much of the fact that Tim Cahill, Autoliv's corporate witness, was present at the tear down of the Mazda buckle; however Defendant Nissan was not a party to that litigation. Nissan's knowledge of that matter, pending at the time of Dr. Good's deposition, was limited and none of the testing apparently done as part of that investigation had been produced in this litigation until the Rebuttal Report.

### D. Dr. Good's New Timing of the Fracture Opinion Is Discoverable

In his January 31, 2012 Report, Dr. Good states, "The time of fracture of the guide vane on the subject buckle is unknown at this time." 1/31/2012 Rpt at 14, attached as Exhibit 6. In his May 2012 deposition, Dr. Good reiterated:

Q:   You don't know when the chip in the subject buckle broke off, do you?

A:   I do not know that.

Q:   You don't know if it was before, during, or after this accident, do you?

A:   I – I certainly – I doubt it was after, but I – I don't know.

Ex. 3, 94:7-13.

In his Rebuttal Report, Dr. Good opines for the first time "[t]he fracture surface of the guide vane was clean and <u>exposed recently in the operational history of the buckle</u>." Ex. 4, p. 9. This new opinion is critical to the Plaintiff's claim because under Plaintiff's theory of defect, the fracture must occur very close in time to the accident – most likely at the tongue insertion just prior to the accident. Dr. Good's previous admission that he could not opine to a reasonable degree of certainty when the fracture occurred was fatal to Plaintiff's defect theory. Defendants must be allowed to depose Dr. Good regarding this new opinion and the basis for it.[2]

### E. Other Issues Noted In Dr. Good's Report are Discoverable.

Defendants refer the Court to their initial brief regarding the additional issues raised in the Rebuttal Report, including slow engagement of the latch plate, load marks on the buckle components, and Dr. Good's alternative design testing. Dr. Good's

---

[2] Defendants' deposition of Dr. Russell Dunn does not eliminate the need to depose Dr. Good regarding his opinions regarding the time of the fracture. Dr. Dunn was merely a photographer. The fracture surface opinions in this case are being offered by Dr. Good exclusively.

14

discussion of the alleged acceptance of slow insertion of the latch plate into the buckle as "representative of conditions of actual use" has relevance in this matter only if Dr. Good is opining that Ms. Middleton slowly inserted her latch plate on the day of the crash. If that is the case, Defendants should be allowed discovery on the basis for any opinion he may offer as to the manner in which Ms. Middleton buckled her seatbelt and the relevance of this opinion to his defect theory. The basis for Dr. Good's alternative design opinion is also subject to discovery. Plaintiff's objection to producing Dr. Good to discuss his alternative design testing is especially egregious since Plaintiff has still not produced all of the underlying data for Dr. Good's computations. Right now, Defendants can only take Dr. Good's word that such data supports his opinions.

## IV.  Conclusion

Defendants believe that the theory proffered by Plaintiff to explain Ms. Middleton's tragic death is physically impossible. Therefore, it is understandable that Plaintiff asks this Court to turn a blind eye to the contradictory assumptions and unsupported hypothesis that Dr. Good is attempting to foist upon it. The Federal Rules, however, have safeguards in place – the discovery process and Rule 702 review – that prevent unreliable evidence from being presented to a jury, resulting in unsustainable verdicts. Defendants respectfully ask this Court to allow them the opportunity to conduct reasonable discovery into the opinions of Dr. Good and the bases for those opinions disclosed in his Rebuttal Report served on January 29, 2013.

BOWMAN & BROOKE, LLP

By: /s/ Courtney C. Shytle
Joel H. Smith
Federal Bar No. 3910
E-Mail: joel.smith@bowmanandbrooke.com
Courtney C. Shytle
Federal Bar No. 7148
E-Mail: courtney.shytle@bowmanandbrooke.com
Angela G. Strickland
Federal Bar No. 9824
E-Mail: angela.strickland@bowmanandbrooke.com
1441 Main Street, Suite 1200
Columbia, SC  29201
(803) 726-7420

Attorneys for Nissan Motor Co., Ltd. and Nissan North America, Inc.

NELSON MULLINS RILEY & SCARBOROUGH

By:/s/Deirdre S. McCool (with permission)
Deirdre S. McCool
Federal Bar No. 5518
E-Mail: Deirdre.McCool@nelsonmullins.com
151 Meeting Street, Suite 600
Charleston, SC 29401
(843) 853-5200

Attorney for Autoliv ASP, Inc.

Columbia, South Carolina

March 21, 2013