IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| KENT H. MIDDLETON, JR., AS PERSONAL REPRESENTATIVE OF THE ESTATE OF AMANDA MIDDLETON,<br>     Plaintiff,<br><br><br>NISSAN MOTOR COMPANY, LTD., NISSAN NORTH AMERICA, INC., AUTOLIV, INC. AND AUTOLIV ASP, INC.,<br>     Defendants. | )<br>) CASE NUMBER: 7:10-cv-02529-MGL<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF ACCIDENT CAUSATION IN A CRASHWORTHINESS CASE AND CERTAIN OTHER EVIDENCE**

Plaintiff Kent H. Middleton, Jr., as Personal Representative of the Estate of Amanda Middleton, hereby moves, for an Order *in Limine* excluding from Defendants' presentation at trial any evidence and/or testimony by Defendants, through Defendants' counsel, witnesses or otherwise regarding the following matters:

1. The cause of the rollover in this crashworthiness case;

2. Unsubstantiated allegations related to drug diversion and drug use by Mrs. Middleton that were made over six months prior to her death;

3. Toxicology test results from blood drawn from Mrs. Middleton thirty-six hours post-crash that revealed only the lowest therapeutic levels of anxiety medication detectable; and

4. An unidentified and uncollected syringe and medicine vial seen on the roadway near the location of the crash.

## FACTS

This is a products liability action arising out of a single vehicle accident that occurred on I-85 in Spartanburg County on June 3, 2008. On the morning of this accident, the decedent, Amanda Middleton, was returning home after working the night shift at her job as a nurse. She was the belted driver of a 2000 Nissan Xterra.

For unknown reasons, the Nissan Xterra left the paved portion of the roadway and went onto the right shoulder and then was driven back on to paved portion when it began to roll over. The Xterra ultimately came to rest in the opposing lanes of I-85. At some point during the rollover, Mrs. Middleton's seatbelt unlatched and she was thrown about in the vehicle where she suffered fatal injuries. This action was instituted against Nissan as manufacturer and distributor of the 2000 Xterra, and Autoliv, the supplier of the seatbelt buckle. The Complaint alleges that the seatbelt buckle unlatched due to a design defect or manufacturing defect.

## ARGUMENT

The purpose of a trial is to discover the true facts underlying the dispute, and to achieve this goal, the law of evidence permits the parties to present evidence "that bears on the issue to be decided." 1 Strong, et al., McCormick on Evidence, 4th Ed. (West Pub. Co., 1992), §184. The purpose of a motion *in limine* is to narrow the evidentiary issues for trial and eliminate unnecessary trial interruptions. Tompkins v. Eckerd, 2012 WL 1110069 (D.S.C. Apr. 3, 2012) (citing Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1069 (3d Cir.1990)).

Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. However, relevant evidence may be

excluded when its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  Fed. R. Evid. 403; Buckley v. Mukasey, 538 F.3d 306, 318 (4th Cir. 2008).  Unfair prejudice occurs when "there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence." United States v. Williams, 445 F.3d 724, 730 (4th Cir. 2006) (internal quotation marks, alteration, and citation omitted).

      **I.**      **Any evidence relating to the cause of the original accident should be excluded under the crashworthiness doctrine.**

A crashworthiness case involving a motor vehicle is sometimes referred to as a "secondary impact," "second collision," or "enhanced injury" case. 62A Am.Jur.2d Products Liability § 1020 (1997).  This is because a defendant's liability is based on an alleged failure to protect the occupants of a vehicle from the consequences of the crash rather than liability for the crash itself.  Id.  It is well-settled in South Carolina that "[u]nder the crashworthiness doctrine, liability is imposed not for defects that cause collisions but for *defects that cause injuries after collisions occur*." Jimenez v. DaimlerChrysler Corp., 269 F.3d 439, 452 (4th Cir. 2001) (emphasis added) (citing Mickle v. Blackmon, 252 S.C. 202, 166 S.E. 2d 173, 185-87 (1969)). "Accordingly, evidence about the cause of the original accident is not relevant." Id.  As such, the Fourth Circuit Court of Appeals has held that evidence relating to the cause of the original accident is properly excluded in a crashworthiness case. Id. at 453.

As early as 1916 in MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 150 (1916), the court adopted the rule that whenever the danger can reasonably be foreseen, there is a duty on the part of a product manufacturer to exercise ordinary care to avoid the injury.  Later, in Ford Motor Co. v. Zahn, 265 F.2d 729, 731-34 (8th Cir. 1959), the court applied this rule to an action in which a vehicle operator seriously injured his eye on the jagged edge of an ashtray located in

the center of the dashboard of the vehicle when the driver abruptly applied the brakes, adding that "the record reveals that defendant was fully conscious of the necessity of guarding against injuries resulting from such occurrences."

Seven years later, in his dissenting opinion in Evans v. General Motors Corp., 359 F.2d 822, 825-28 (7th Cir. 1966), Judge Roger Kiley cited "the appalling predictable rate" of injury and death in automobile accidents and opined that motor vehicle manufacturers had a duty to provide "reasonable protection" against "death and injury from accidents which are expected and foreseeable yet unavoidable by the purchaser despite careful use."

These cases were followed in 1968 by the opinion of the Eighth Circuit Court of Appeals in Larsen v. General Motors Corp., 391 F.2d 495, 502 (8th Cir. 1968), where the court stated:

> . . . The manufacturer should not be heard to say that it does not intend its product to be involved in any accident when it can easily foresee and when it knows that the probability over the life of its product is high, that it will be involved in some type of injury-producing accident. . . .
>
> . . . Where the manufacturer's negligence in design causes an unreasonable risk to be imposed upon the user of its products, the manufacturer should be liable for the injury caused by its failure to exercise reasonable care in the design. These injuries are readily foreseeable as an incident to the normal and expected use of an automobile. . . . [A] frequent and inevitable contingency of normal automobile use will result in collisions and injury-producing impacts. No rational basis exists for limiting recovery to situations where the defect in design or manufacture was the causative factor of the accident . . . . Where the injuries or enhanced injuries are due to the manufacturer's failure to use reasonable care to avoid subjecting the user of its products to an unreasonable risk of injury, general negligence principles should be applicable. The sole function of an automobile is not just to provide a means of transportation, it is to provide a means of safe transportation or as safe as is reasonably possible under the present state of the art.

The court in Larsen also emphasized the fact that collisions, *"with or without fault of the user,"* are "clearly foreseeable" to the manufacturer, stating as follows:

4

> . . . [S]uch manufacturer is under a duty to use reasonable care in the design of its vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of a collision. *Collisions with or without fault of the user are clearly foreseeable by the manufacturer and are statistically inevitable.*

Larsen, 391 F.2d at 502 (emphasis added).

The following year, in Mickle v. Blackmon, 252 S.C. 202, 166 S.E.2d 173 (1969), the Supreme Court of South Carolina adopted the Eighth Circuit's opinion in Larsen, stating in part as follows:

> It is a matter of common knowledge that a high incidence of injury-producing motor vehicle collisions is a dread concomitant of travel upon our streets and highways, and that a significant proportion of all automobiles produced are involved in such smashups at sometime during their use. Thus, an automobile manufacturer knows with certainty that many users of his product will be involved in collisions, and that the incidence and extent of injury to them will frequently be determined by the . . . design . . . of . . . interior components . . . . By ordinary negligence standards, a known risk of harm raises a duty of commensurate care. We perceive no reason in logic or law why an automobile manufacturer should be exempt from this duty.

Mickle, 166 S.E.2d at 185 (emphasis added).

Four years later, in Engberg v. Ford Motor Co., 205 N.W.2d 104, 105-08 (1973), the Supreme Court of South Dakota affirmed an award in favor of a motorist who was ejected from his motor vehicle as a result of the defective design of his seat belt, noting that there was evidence "that the fatal injury occurred outside of the car and that had the seat belt remained intact and the decedent remained inside the car, the amount of injury would have been minor." In rejecting Ford's defense of contributory negligence for the decedent's failure to keep his car under control, the court in Engberg, relying on Larsen, stated as follows:

> Likewise, we find no merit in the defendant's claim that the proximate cause of the decedent's death was his own contributory negligence in failing to keep his car under control. The fact that the

5

>allegedly defective design of the seat belt did not cause the original accident does not preclude recovery.

Engberg, 205 N.W.2d at 108.

A leading law review article on the crashworthiness doctrine is Harris, Enhanced Injury Theory: An Analytic Framework, 62 N.C. L. Rev. 643 (April 1984). Also relying on the Eighth Circuit's opinion in Larsen, Mr. Harris states as follows:

>Most American jurisdictions have adopted the doctrine of strict liability in tort and thus have recognized an injured party's right to recover damages for injuries caused by a defective product. In 1965 the doctrine was recognized and promoted by section 402A of the Restatement (Second) of Torts. In those states that have adopted section 402A, a claimant can recover if the defective product caused an injury-producing accident. After some disagreement, it has been widely recognized that a manufacturer will also be held liable for *enhanced* injuries resulting from a defect even if the defect did not cause the underlying accident.

62 N.C. L. Rev. at 643-644.

In Binakonsky v. Ford Motor Co., 133 F.3d 281, 287 (4th Cir. 1998), the Fourth Circuit Court of Appeals held that, in a strict liability crashworthiness action under Maryland law, an automobile driver's intoxication was not a defense because:

(a) ". . . contributory negligence is not a defense in a strict liability action." Binakonsky, 133 F.3d at 287; and

(b) While, under Maryland law, a drunk driver may be held to have assumed the risk of "injury from the initial impact," it "cannot be inferred that he assumed the risk of an allegedly defective fuel delivery system." Id. at 289.

>The fact that Binakonsky was drunk does not make the physical aspects of the crash any more bizarre. . . . On this issue, Maryland law is clear. *"The fact that negligent driver may be the initial cause of an accident does not abrogate the manufacturer's duty to use reasonable care in designing the automobile to reduce the risk of 'secondary impact injuries.'"*

6

Id. at 288 (emphasis added).

In holding that the driver's negligence in running a red light in a crashworthiness action was irrelevant, Judge Falcon Hawkins of the United States District Court, District of South Carolina, Charleston Division, stated:

> Chrysler challenges this court's evidentiary rulings disallowing evidence of fault . . . in the underlying accident. . . . This court finds that the *evidence of fault in the underlying accident was properly excluded. . . .*
>
> Ms. Barrientos allegedly failed to obey a traffic signal. Because Plaintiff's claims focus on the crashworthiness of the minivan, any alleged negligence on Ms. Barrientos's part is irrelevant and properly excluded. Additionally, the Court finds that the potential for prejudice and confusion if that evidence had been introduced would have outweighed its probative value.
>
> This issue turns on an interpretation of South Carolina law. South Carolina is at the forefront of imposing liability on defectively designed automobiles that exacerbate injury because of a design defect. Indeed, South Carolina was one of the very first states to adopt the crashworthiness doctrine. *See Mickle v. Blackmon*, 252 S.C. 202, 166 S.E.2d 173, 187 (1969). . . . The crashworthiness doctrine imposes liability on automobile manufacturers for design defects that enhance, rather than cause, injuries. . . . The doctrine applies if a design defect, not causally connected to the collision, results in injuries greater than those that would have resulted were there no design defect. . . . The issue for purposes of a crashworthiness case, therefore, is enhancement of injuries, not the precipitating cause of the collision.

Jimenez v. Chrysler Corp., 74 F. Supp. 2d 548, 564-65 (D.S.C. 1999) (emphasis added) rev'd in part, vacated in part sub nom. Jimenez v. DaimlerChrysler Corp., 269 F.3d 439 (4th Cir. 2001).

In holding that evidence concerning the underlying accident was irrelevant, Judge Hawkins further stated that:

> It should be noted that, applying this same rule, several courts have concluded that any form of fault or negligence by a driver or

7

> passenger of an automobile is immaterial under the crashworthiness doctrine. . . .
>
> The [crashworthiness] theory . . . focuses alone on the enhancement of resulting injuries. . . . It is enough if the design defect increased the damages. *So any participation by the plaintiff in bringing the accident about is quite beside the point.*

Id. at 566 (emphasis added).

Finally, in Jimenez v. DaimlerChrysler Corp., 269 F.3d 439, 452-453 (4th Cir. 2001), the Fourth Circuit reviewed and approved the opinion of Judge Hawkins excluding evidence of the cause of the underlying accident, stating as follows:

> . . . The Estate's theory of liability was that DaimlerChrysler designed and sold a defective product that did not, in this case, cause the accident, but rather caused an enhanced injury when the car was involved in an accident . . . . Under the crashworthiness doctrine, liability is imposed not for defects that cause collisions but for defects that cause injuries after collisions occur. *See Mickle v. Blackmon*, 252 S.C. 202, 166 S.E.2d 173, 185-87 (1969). Accordingly, evidence about the cause of the original accident is not relevant. *See id.*; Thomas V. Harris, *Enhanced Injury Theory: An Analytic Framework*, 62 N.C. L. Rev. 643, 673 (1984) . . . .
>
> DaimlerChrysler argues that because South Carolina has adopted the doctrine of comparative negligence . . . Barrientos' responsibility for the original accident is relevant to the amount of recovery. But South Carolina has not directly addressed this issue in the context of a crashworthiness case, and there is a split of authority in other jurisdictions. . . . Although we cannot be certain what rule South Carolina would adopt, *we cannot say that the district court erred in concluding that in light of the crashworthiness principle, the cause of the original accident was not relevant to proving a claim for enhanced injury.*

Jimenez, 269 F.3d at 452-453 (emphasis added).

This is a crashworthiness case in which no claim is asserted that the design defect or manufacturing defect caused the underlying rollover. As a result, any evidence offered by the Defendants referencing the cause of the underlying rollover should be excluded. This includes any evidence in the record regarding: (1) the speed at which Mrs. Middleton may have been

8

driving; (2) the driving maneuvers prior to the rollover; (3) the number of shifts she worked leading up to the day of the crash; (4) whether she may have been asleep or falling asleep while driving; (5) drug diversion or drug use; and (5) toxicology results. Under the crashworthiness doctrine as it has been applied in South Carolina in accordance with <u>Mickle</u> and <u>Jiminez</u>, the cause of the underlying rollover is not relevant. Further, any probative value that it may have is outweighed by its prejudicial effect. Therefore, any evidence of rollover causation in this crashworthiness case should be excluded.

### II. Any and all evidence of Mrs. Middleton's alleged prior drug diversion and drug use should be excluded.

Defendants seek to enter evidence and testimony regarding allegations that were made over six months before the car wreck that is the subject of this lawsuit against Mrs. Middleton for drug diversion and drug use to suggest that she was a chronic drug user, despite the fact that the allegations were never substantiated. As a threshold matter, the use of this evidence as causation of the rollover, the original accident, should be excluded under South Carolina's application of the crashworthiness doctrine as explained above. Furthermore, the mention of these subjects is irrelevant would have no bearing on the elements of liability or damages in this case. Finally, any possible probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.

Only relevant evidence is admissible. Fed. R. Evid. 402. In order for any evidence of Mrs. Middleton's alleged prior drug diversion or drug use to be admissible, it must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

9

This evidence does not establish any proposition of legal significance to this products liability litigation. Further, substantial record evidence flatly contradicts these allegations.

Over six months prior to her death, Mrs. Middleton received a notice that a complaint had been made against her nursing license related to the allegations stated above. Though the allegations were unsubstantiated, in an effort to maintain her nursing license, she voluntarily submitted herself to monitoring and assessment with the S.C. Recovering Professionals Program ("RPP") which: (1) did *not* give her a substance abuse diagnosis; (2) found that drug monitoring of her was *unnecessary*; and (3) discharged her immediately from the program. (RPP Letters, 3-26-08, attached as Ex. 1.) The official discharge from RPP was based in part upon an evaluation performed by psychiatrist Dr. Craddock at Hillcrest Behavioral Health who found no diagnosis for substance abuse. (Id.) Importantly, Mrs. Middleton underwent urine and hair drug screenings, the results of which were all were uniformly negative. (Id.; AccuDiagnositcs Negative Hair Test, 2-13-08, Ex. 2; Accurate Diagnostics Negative Urine Test, 3-17-08, Ex. 3.)

In addition to the official RPP finding that Mrs. Middleton had no substance abuse diagnosis, there is no evidence in the record to support a finding of drug diversion. Instead, the only evidence with regards to drug diversion is pure, unfounded speculation. For example, Maureen Loehr, a compliance employee at Spartanburg Regional Medical Center who accused Mrs. Middleton of diverting drugs, has testified that: (1) she did not know Mrs. Middleton (Loehr Dep. 5:4-5, attached as Ex. 4); (2) no one witnessed Mrs. Middleton engage in drug use (Id. at 28:2-5); (3) she had no personal knowledge of what happened to the allegedly diverted drugs – whether they were used, given away, or sold (Id. at 63:4-24); and (4) she had no personal knowledge of Mrs. Middleton using drugs. (Id. at 62:9-22.) Moreover, there is no evidence that Spartanburg Regional Medical Center ("SPRMC") made a finding that Mrs. Middleton was

diverting drugs. To the contrary, SPRMC provided a job *recommendation* to her for future employment. (SPRMC Recommendation, Ex. 5.)

In summary, with regards to Mrs. Middleton's alleged prior drug diversion and drug use, the evidence only shows that there was *no finding* of drug diversion, *negative* urine and hair drug *tests results,* and *admitted speculation as to whether or not she ever used any drugs whatsoever.* Not only is this evidence irrelevant to the case, any potential probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. Fed. R. Evid. 403. Because any evidence of Mrs. Middleton's alleged prior drug diversion and drug use is irrelevant and highly prejudicial, it should be excluded in its entirety under Federal Rules of Evidence 401, 402, and 403.

## III.     Any evidence of toxicology results should be excluded.

Defendants seek to enter evidence regarding toxicology results derived from blood samples taken approximately thirty-six hours after the crash. (SLED Forensic Services Laboratory Report, p. 2, Ex. 6.) Defendants seek to enter evidence of trace levels of an anxiety medicine – *measured at the lowest therapeutic level detectable* – to suggest that Mrs. Middleton was impaired so greatly that she could not operate a motor vehicle. Mrs. Middleton's mother, Dena Crump, has testified that she gave her daughter one Valium two days before the accident because of how upset Mrs. Middleton was over her dying uncle:

> Q. Did she ask you for those medications?
>
> A. No. I volunteered it because she was upset and I know that that's what they give me for anxiety. That's what I get for anxiety, so...

(Crump Dep. 45:22-25; 54:10-56:24, Ex. 7.)  Mrs. Middleton's mother also testified that she had given her daughter medication on two or three other occasions in 2008 to help cope with several family deaths she experienced in only six months' time:

> Q.  Okay.  How would you describe Amanda when you talked to her?
>
> A.  She was upset about her uncle.  I mean, just hard, you know.  We had a lot of death and we -- you have to know in our family that year, you know, my aunt -- his son -- his son passed away, his daughter-in-law -- they lived beside him.  His son -- my uncle's son died, then his wife died, and then my Uncle Johnny died which would be her great-uncle, died.  This was all within six months.  And then Mike, which was her -- they called him their stepdad because for 17 years he was, you know, their stepdad.
>
> Q.  Right.
>
> A.  He died, all of this was within six months.
>
> Q.  Wow.

(Id. at 44:5-21; 57:16-22.)  Defendants seek to introduce evidence to imply that a trace level of anxiety medicine, the lowest that can even be detected, somehow impaired Mrs. Middleton to such a degree that she could not drive a vehicle.  Defendants seek to make this implausible connection through several witnesses as well as the toxicology results themselves.

However, the toxicology results do not correlate the therapeutic trace levels of the anxiety medicine to the accident, and, any probative value of this evidence is substantially outweighed by the danger of unfair prejudice.  And again, the use of this evidence for causation of the rollover should be excluded under South Carolina's application of the crashworthiness doctrine as explained above.

In Kennedy v. Griffin, 358 S.C. 122, 125-26, 595 S.E.2d 248, 249 (Ct. App. 2004), a tractor-trailer turned left in front of Kennedy as he approached in his truck.  Kennedy struck the

tractor-trailer on its rear tires. Id. According to a witness, Kennedy had enough time to see the truck and apply his brakes sooner than he did. Id. at 126, 595 S.E.2d at 250. The witness indicated that he believed he had a safe distance to make the turn, while Kennedy testified the tractor-trailer pulled out in front of him. Id. The Court of Appeals reversed the trial court's admission of toxicology reports showing the presence of marijuana in Kennedy's blood. Id. at 128–29, 595 S.E.2d at 251.

The court reasoned that no evidence regarding the level of marijuana in Kennedy's system or how long it had been present was presented. Id. at 128, 595 S.E.2d at 251. Furthermore, no witnesses testified that Kennedy smelled of marijuana. Id. In addition, "the circumstantial evidence did not support an inference that Kennedy was impaired *due to marijuana use*." Id. (emphasis added.) Ultimately, the court found that the admission of the toxicology result "was more prejudicial than probative because there was no correlation between the marijuana and the accident. Accordingly, the trial judge erred in allowing its admission." Id. at 128-29, 595 S.E.2d at 251 (citing Simco v. Ellis, 303 F.3d 929, 933-34 (8th Cir. 2002) (holding that evidence of a truck driver's cocaine use at the time of the accident should have been excluded as prejudicial where the toxicology test did not support a finding of intoxication and the mere mention of cocaine could inflame a jury); State v. McClain, 525 So.2d 420 (Fla. 1988) (finding the trial court did not abuse its discretion in excluding evidence of trace amounts of cocaine in the defendant's blood where chemist could not express opinion on whether it would have affected defendant's driving and it would have seriously prejudiced defendant in the eyes of the jury); Martinez v. Graves, 2003 WL 21466962 (Tex. App. 2003) (affirming the trial judge's exclusion of evidence of cocaine in the deceased's system because the amount of cocaine was not established and there was no correlation between the cocaine and the accident)).

Here, the toxicology results show that the blood sample contained .02 milligrams per liter of diazepam – a therapeutic level – and .02 milligrams per liter of nordiazepam – an amount below therapeutic levels. (SLED Forensic Services Laboratory Report, Ex. 6.) Further testing by National Medical Services ("NMS") confirmed nordiazepam in the blood, but did not even confirm the presence of diazepam. (NMS Test, Ex. 8.)

Diazepam and its metabolite, nordiazepam (commonly known as the anxiety medication, Valium) are in the benzodiazepine category. As a result, *there is no way to perform any test to determine how long the substance had been present in the blood or what the concentration was at some time in the past* – testing commonly known as retrograde analysis. The Defendant's expert forensic toxicologist, Ms. Garvin, explains how this analysis cannot be performed on the substance found in Mrs. Middleton's blood:

> Q. I mean, you've done retrograde analysis and extrapolations related to the use of alcohol as your -- in your job as a toxicologist, correct?
>
> A. It can be done with alcohol, if sufficient factors are available, yes.
>
> Q. And that's something that you've probably routinely done in your job as a forensic toxicologist or as a clinical toxicologist, correct?
>
> A. Frequently asked to do it, yes.
>
> Q. You can't do that with benzodiazepines, can you?
>
> A. No, sir.
>
> Q. And the reason you can't is because it's eliminated from the body differently, correct?
>
> A. The kinetics of the drug are completely different. As a general rule, we don't perform retrograde extrapolation on drugs other than alcohol.

> Q. So you can't and you haven't in this case, correct?
>
> A. Correct.

(Garvin Dep. 44:4-25, Ex. 9.) Just as in Kennedy, there is no evidence regarding the level of diazepam or nordiazepam in Mrs. Middleton's body *at the time of the crash* or *how long it had been present*. Dr. Smith, another expert witness for the Defendants, testified that Mrs. Middleton could have taken diazepam *several days before* the crash. (Smith Dep. 49:3-6, attached as Ex. 10.) Furthermore, Dr. Smith testified that determining *when* Mrs. Middleton could have taken diazepam is "fraught with a large range". (Id. at 49:8-11.) Not only is there no evidence of what the *concentration* of medicine was in Mrs. Middleton's blood or *when* she may have taken it, there also is no evidence of *how much* she took or in *what manner* she may have taken it:

> Q. Is it your testimony that -- and you don't know what dose she took, correct?
>
> A. I don't know what dose, no, or what route. That's correct.

(Garvin Dep. 83:10-13, Ex. 9.)

It has been established that the amount of diazepam/nordiazepam in Mrs. Middleton's blood at the time of the crash is unknown, and there is no evidence that it was at such a level so as to impair Mrs. Middleton's judgment. In fact, Ms. Garvin explains that there is no widely accepted correlation between the concentration of a benzodiazepine in the blood and driving impairment, because it simply does not exist:

> Q. You would agree with me that the reason that there's no widely accepted correlation between the drug concentration in blood and the corresponding level of driving impairment is because there are so many variables that come into play and that there are factors such as tolerance and other things that make it too variable?
>
> A. Tolerance can have an impact on driving impairment. But frankly, in my opinion, the reason why there's not a direct correlation is because we haven't set out to establish those for

15

>   drugs other than alcohol. That's not to say that we can't; we just haven't done it.
>
>   Q. But it hasn't been done, correct?
>
>   A. Correct.

(Id. at 51:6-21) (objection omitted.) In Kennedy, there was no evidence "whether the marijuana was of such a level as to impair Kennedy's judgment." Kennedy, 358 S.C. 122, 128, 595 S.E.2d 248, 251 (Ct. App. 2004). Similarly, there is no evidence in this case whether the diazepam/nordiazepam was of such a level as to impair Mrs. Middleton's judgment on the day of the crash. There is no correlation between the diazepam/nordiazepam and the issues of liability or damages in this case, and therefore, any probative value of the toxicology results would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. Fed. R. Evid. 403. As a result, any evidence with regards to the toxicology results should be excluded.

**IV. Any testimony or evidence related to an unidentified syringe and medicine vial seen near the location of the crash should be excluded.**

Defendants seek to imply through the questioning of witnesses that a medicine vial and syringe seen near the location of the crash, but unidentifiable in any other way, is somehow linked to Amanda Middleton *and* could have contained illegal prescription drugs. A witness at the crash seen described it as follows:

>   Q. When you stopped at the scene did you see any evidence of any alcohol or anything like that?
>
>   A. No. The only thing I saw was a syringe and a bottle of something. I assumed maybe it was insulin or something. But she was obviously a nurse. So she probably had that with her. But I mean, I didn't sit there and look at the vial to see what it was.
>
>   Q. Did you know what it was one way or the other?
>
>   A. No.

(Mahon Dep. 14:1-12, attached as Ex. 11.)   Importantly, neither item was found by officials that investigated the scene; neither item is mentioned in any investigative report; and there is no evidence in the record of what these items were, what they may have contained, or to whom they may have belonged.  Defense counsel have repeatedly mentioned these items in hypothetical questions to witnesses they have deposed suggesting to the witnesses that the presence of these items on the roadway at the scene of the crash should somehow suggest that they contained illegal drugs that Mrs. Middleton was using at the time of her crash.  There is no foundation for such a suggestion because the items were never recovered or identified.

As discussed above, the use of this evidence for causation of the underlying accident should be excluded under the crashworthiness doctrine as applied in South Carolina.  In addition, the mention of these items is irrelevant would have no bearing on the elements of liability or damages in this case.  Further, any possible probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.

## **CONCLUSION**

For the reasons stated herein, (1) any evidence of the cause of the original accident; (2) Mrs. Middleton's alleged prior drug diversion and drug use; (3) any evidence of toxicology test results showing the lowest of therapeutic levels of anxiety medication in her blood; and (4) any evidence of a syringe and vial seen near the location of the crash are irrelevant to the issues in this product liability case.  Furthermore, any probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.  Therefore, Plaintiff respectfully requests this Court exclude this evidence.

                BY: /s/ David B. Yarborough, Jr.
                David B. Yarborough, Jr., Esquire
                Fed ID #7336
                William Applegate, Esquire
                Fed ID #9261
                YARBOROUGH APPLEGATE LLC
                291 East Bay Street, Second Floor
                Charleston, SC  29401

                and

                PETERS, MURDAUGH, PARKER, ELTZROTH
                & DETRICK, P.A.

                Ronnie L. Crosby
                Fed ID #6311
                rcrosby@pmped.com
                William F. Barnes, III
                Fed ID #10639
                wbarnes@pmped.com
                Post Office Box 457
                101 Mulberry Street East
                Hampton, SC 29924
                (803)943-2111

March 27, 2013
Charleston, South Carolina