UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

KENT H. MIDDLETON, JR., as          )        Civil Action No.: 7:10-02529-MGL
Personal representative of          )
The Estate of Amanda Middleton,     )
                                    )
                                    )
            Plaintiff,              )
                                    )        **DEFENDANTS NISSAN MOTOR**
    v.                              )        **COMPANY, LTD., NISSAN**
                                    )        **NORTH AMERICA, INC., AND**
                                    )        **AUTOLIV ASP, INC.'S MOTION**
NISSAN MOTOR COMPANY, LTD.,         )        **FOR SUMMARY JUDGMENT**
NISSAN NORTH AMERICA, INC.,         )        **AND MEMORANDUM IN**
and AUTOLIV ASP,                    )        **SUPPORT**
INC.,                               )
            Defendants.             )
_____ )

Defendants, Nissan Motor Company, Ltd., Nissan North America, Inc., and

Autoliv ASP, Inc., ask this Court to grant summary judgment in this automotive product

liability case because an impaired driver cannot bring a first party action for injuries

suffered in an automobile accident caused by that driver's own impairment.   South

Carolina tort law, grounded in sound public policy, precludes recovery under the

undisputed facts of this case, and Mrs. Middleton was, in any event, more than fifty

percent responsible for her own death.  Defendants are, therefore, entitled to judgment

as a matter of law.

## UNDISPUTED FACTS

On the morning of June 3, 2008, Amanda Middleton was driving a 2000 Nissan

Xterra, VIN SNIED28TSYC589847, northbound on Interstate 85 when she wrecked the

Xterra.  **ECF 1**.  She was on her way home from an overnight nursing shift at

Greenville's St. Francis Hospital, where she was working as a traveling nurse.

Advanced Nursing Traveler Confirmation Sheet, Middleton-BonSecours-000033, attached as **Exhibit 1**; 12/1/11 deposition Amy Johnson, attached as **Exhibit 2**, at 55:24-56:9.    Jason Mahon, an eyewitness to the accident who was also travelling northbound on I-85, testified as follows:

> So I was in the middle lane, and Ms. Middleton came flying up behind me, almost rear-ended me. I dropped over to get out of the way. I immediately called 911 because she was just all over the road. I followed her actually all the way until the accident. I was on the phone with 911...
>
> I was telling Highway Patrol, you need to get somebody here because she was literally going from over towards the wall all the way off the right side of the road, all the way back on the road, I mean, using all three lanes of traffic for miles. And I actually got up beside her, tried to get her attention, you know, blew my horn at her, and nothing, nothing I could do would actually…

6/14/11 deposition of Jason Mahon, attached as **Exhibit 3**, at 6:8-23.    Mr. Mahon was asked whether he could tell if Mrs. Middleton was making an attempt to drive the vehicle, to which he answered, "No. She was just head down, up and down, up and down. All over the road. I actually—I'm not sure how she made it as far as she did without having an accident." **Exhibit 3** at 6:24-7:4; 13:1-12. The witness reiterated that Mrs. Middleton was totally unresponsive when he blew his horn. **Exhibit 3** at 13:1-7.

At one point after she "blew right by" him, Mr. Mahon pulled next to Mrs. Middleton and saw her leaning forward while her head continued to nod up and down with her eyes "wide open." **Exhibit 3** at 22:20-25:14.[1] He testified that Mrs. Middleton's

---

[1] Though she was leaning forward, Mr. Mahon did not notice Mrs. Middleton to be wearing her seatbelt. **Exhibit 3** at 24:12-21.

failure to react upon running off the road and over the "rumble strips"[2] caused him to think "she was intoxicated or something was wrong with her."  **Exhibit 3** at 13:19-23.

As for the wreck itself, Mr. Mahon testified that Mrs. Middleton was travelling at a high speed when she left the right side of the highway, which slopes downward at such a steep angle that, for a time, he could not see the roof of the vehicle.  **Exhibit 3** at 9:7-10:9.  Mr. Mahon then saw her return to the roadway, where the vehicle began rolling over, and "[t]hen went end over end and landed on the roof in the southbound lanes. She never actually even hit the median, the cable barrier.  She went all the way over the cable barriers."  **Exhibit 3** at 9:19-25.  Another eyewitness, Nicholas Picou, testified that Mrs. Middleton's Xterra "barrel rolled at least three or four times before flipping end over end."  6/15/11 Deposition of Nicholas Picou, attached as **Exhibit 5**, at 20:21-21:2.  Mr. Mahon testified that Mrs. Middleton never pressed her brakes at any time from when he first observed her through the end of the accident sequence.  **Exhibit 3** at 10:9-14; 12:24-25.

Both of the above-mentioned eyewitnesses stopped at the scene, where they found Mrs. Middleton to be unresponsive and lying on the roof inside her overturned vehicle.  **Exhibit 5** at 13:2-25; **Exhibit 3** at 15:17-23.  Mr. Mahon also observed an unpackaged syringe and a medicine vial at the scene of the accident.  **Exhibit 3** at 14:1-9; 25:15-26:16.  He described the vial as the sort where "[i]f you go get a flu shot or

---

[2] Rumble strips provide aural and tactile stimuli to drivers.  As the United States Department of Transportation has explained, "Rumble strips are an effective countermeasure for preventing roadway departure crashes.  The noise and vibration produced by rumble strips alert drivers when they leave the traveled way." http://safety.fhwa.dot.gov/roadway_dept/pavement/rumble_strips/, attached as **Exhibit 4**.

something they take it out and give it to you." **Exhibit 3** at 25:25-26:2. This vial can be observed in photographs of the wrecked vehicle. 6/3/08 Photographs, NNA-000076-77, attached as **Exhibit 6**.

Emergency responders found Mrs. Middleton to be unresponsive, and she was transported to Spartanburg Regional Medical Center. Westview-Fairforest Fire Dept. Patient Care Form, NNA-000034-35, attached as **Exhibit 7**. The responders did not administer any drugs to Mrs. Middleton. **Exhibit 7**. A urine sample, taken after her arrival at Spartanburg Regional and approximately an hour and twenty minutes after the accident, tested positive for both opiates and benzodiazepines. South Carolina Traffic Collision Report, attached as **Exhibit 8;** Spartanburg Regional Healthcare System Records, MIDDLETON-SRMC-000064-66, attached as **Exhibit 9**. Mrs. Middleton did not have a prescription for either of these two controlled substances. Blood serum/plasma was also drawn shortly after Mrs. Middleton arrived at the hospital, but its quantity was insufficient for drug testing. NMS Labs 8/21/12 Supp. Report, MIDDLETON-NMS-000001-000004, attached as **Exhibit 10**.

Mrs. Middleton was pronounced dead at 4:45 PM on June 3, 2008. Spartanburg County Coroner's Investigative Notes, MIDDLETON-CORONER-000003, attached as **Exhibit 11**. However, she was an organ donor, and so was kept on a respirator until June 5. LifePoint Progress Notes, MIDDLETON-LIFEPOINT-000059-61, attached as **Exhibit 12**. During this period and approximately 39 hours after Mrs. Middleton had been brought to the hospital, blood was drawn. SLED Forensic Services Laboratory Report, MIDDLETON-SLED-000002-000006; 000027, attached as **Exhibit 13**. SLED confirmed that this sample tested positive for benzodiazepines. **Exhibit 13**.

Two additional blood samples were taken at that time, more than a day and a half after the crash, and maintained in the Spartanburg County Coroner's Office until they were tested in relation to this litigation. Again, both samples confirmed the presence of benzodiazepines in Mrs. Middleton's blood. **Exhibit 10**.

Mrs. Middleton had not been prescribed opiates or benzodiazepines at the time of the accident. Plaintiff's Answers to NNA's 2nd Interrogatories, Interrogatory No. 2, attached as **Exhibit 14**. There were also no medications administered as treatment for the crash injuries that would account for the positive drug screens. **Exhibit 12**. However, Mrs. Middleton's mother testified that she had given her daughter Xanax, Valium, or both on the day before the accident. 11/30/11 Deposition of Dena Crump, attached as **Exhibit 15**, at 30:24-31:14; 33:16-19.

Mrs. Middleton had been a nurse, and her death caused the South Carolina Labor, Licensing, and Regulation's Nursing Board to close an ongoing investigation it had been conducting into her nursing license. Coggins correspondence with SC Dept. of Labor, Licensing and Regulation, attached as **Exhibit 16**. The investigation related to a time when Mrs. Middleton had been employed by Spartanburg Regional Medical Center; she had quit the job in November 2007 rather than take a drug test that had been requested after one of the hospital's compliance specialists had noticed first that Mrs. Middleton had signed out prescription pads without authority, and then determined that her on-duty drug dispensing habits indicated she was diverting prescription drugs, including opiates. 5/22/12 Deposition of Maureen Loehr, attached as **Exhibit 17**, at 14:3-15:9; 39:19-24; Spartanburg Regional Healthcare System Employee Charting Note, MIDDLETON-SRMC-000415, attached as **Exhibit 18**; SC DHEC Investigation

Records, MIDDLETON-DHEC-000001-000015, attached as **Exhibit 19**.   During the course of her investigation, Spartanburg Regional's compliance specialist received a number of written statements from Mrs. Middleton's fellow nurses wherein they described instances where, while at work, she had been visibly impaired, unable to walk in a straight line, slurred her speech, fell asleep on a toilet, and had dilated pupils. Spartanburg Regional Medical Center Employee Statements, MIDDLETON-SRMC-000674-000677, attached as **Exhibit 20**.   DHEC was also notified of the investigation. **Exhibit 18**.

After the accident, Mrs. Middleton's husband, Kent Middleton, brought this lawsuit on behalf of her Estate, wherein it is alleged that the driver's side seatbelt buckle in Mrs. Middleton's Xterra was defective such that it unlatched during the rollover because of a plastic "chip" that somehow became jammed in the latching mechanism, causing a false latch condition.   Though Defendants contend Mrs. Middleton was not wearing her seatbelt at all, the law of this State bars recovery under the above-described, undisputed facts.

## LEGAL STANDARD

Ordinarily, factual disputes are to be resolved by a jury, but summary judgment is required when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a). Under such circumstances, the rule is not discretionary but instead "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[I]n evaluating a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party." Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir 1990).

However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Stokes v. Virginia Dept. of Corrections, 2013 WL 725044*1 (4th Cir. 2013) (internal quotation marks omitted). To withstand a motion for summary judgment, the non-moving party has the burden of demonstrating a genuine issue of material fact; "conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of the [non-moving party's] case." Thompson v. Potomac Electric Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (internal citations omitted).

## ARGUMENT

## I.    PLAINTIFF CAUSED THIS ACCIDENT BY DRIVING UNDER THE INFLUENCE

The South Carolina Court of Appeals has described the inquiry into whether a person is "driving under the influence" as follows:

> The proscribed conduct is the operation of a motor vehicle by one who is under the influence of intoxicating liquor or drugs. One is under the influence, within the meaning of the statute, when the ingestion of one or more of the substances listed therein has resulted in the impairment of his faculties. State v. Sheppard, 248 S.C. 464, 150 S.E.2d 916 (1966). 'Under the influence' means sufficiently under the influence as to impair the ability of such driver to operate the vehicle with reasonable care. State v. Caldwell, 231 S.C. 41, 98 S.E.2d 259 (1957). One may be under the influence as contemplated by the traffic laws without being drunk or passed out, or even intoxicated….The question is not whether the defendant is drunk or intoxicated, but whether his condition is such

7

that he could drive with due regard for others and himself.  Dixon v. Weir Fuel Co., 251 S.C. 74, 160 S.E.2d 194 (1968).   Driving under the influence is therefore established by proof that defendant's ability to drive was materially and appreciably impaired.  City of Orangeburg v. Carter, 303 S.C. 290, 400 S.E.2d 140 (1991).

State v. Kerr, 330 S.C. 132, 143-44, 498 S.E.2d 212, 217-18 (Ct. App. 1998).

Under South Carolina law, several categories of evidence are probative of the often outcome-determinative question of whether a driver was impaired by drugs or alcohol.  In broad terms, these categories of evidence used to determine whether a person's "ability to drive was materially and appreciably impaired" are: A) blood and/or urine screens; B) observations of vehicle behavior; C) observations of human behavior; D) the presence of physical objects or conditions that are consistent with the use of alcohol or drugs; E) and evidence of the alleged user's history or habits involving the use of the substance or substances in question.  A survey of the cases shows that the various types of evidence are mutually corroborative—and therefore individually more probative—when two or more are present under the particular facts of a case.

Before discussing the treatment of each of these types of evidence, a brief summary of the above-described evidence showing Mrs. Middleton's impairment is in order:

1. Urine that was drawn approximately one hour and twenty minutes after the crash tested positive for unprescribed opiates and benzodiazepines;

2. A blood sample taken 39 hours, more than a day and a half, after the crash was found by SLED to be positive for unprescribed benzodiazepines;

3. Another blood sample taken more than a day and a half after the accident was found by NMS Labs to be positive for unprescribed benzodiazepines;

4. Eyewitness observations that Mrs. Middleton failed to react to the physical stimulus of a car horn intended to gain her attention;

5. Eyewitness observations that Mrs. Middleton failed to react to the physical stimuli of her car's passage over the rumble strips on the sides of the highway;

6. Eyewitness observations of Mrs. Middleton's head nodding up and down, while she was leaning forward with wide open eyes and, at the same, her car was travelling at a high speed across three lanes of traffic;

7. Extremely reckless driving with a total disregard for all laws of traffic and the safety of others on the roadway, as evidenced by the accident itself and the following eyewitness testimony:

   - "And I kept telling [Highway Patrol], she's all over the road. You guys have to get somebody here now. *She's going to hit somebody. She's going to hurt somebody.*" **Exhibit 3** at 9:2-5 (emphasis added);

   - "I really thought she was intoxicated or something was wrong with her." **Exhibit 3** at 13:22-23;

   - "So I was in the middle lane, and Ms. Middleton came flying up behind me, almost rear-ended me." **Exhibit 3** at 6:8-10;

   - "I immediately called 911 because she was just all over the road." **Exhibit 3** at 6:11-12;

   - "I was telling Highway Patrol, you need to get somebody here because she was literally going from over towards the wall all the way off the right side of the road, all the way back on the road, I mean, using all three lanes of traffic for miles." **Exhibit 3** at 6:16-20;

   - "I'm not sure how she made it as far as she did without having an accident." **Exhibit** 3 at 7:3-4;

8. Testimony that Mrs. Middleton's mother gave her Xanax, Valium, or both on the day before the accident;

9. Eyewitness observations of an unwrapped syringe;

10. Eyewitness observations of a medicine vial that are corroborated by photographic evidence;

11. A prior investigation into Mrs. Middleton's potential use and improper diversion of controlled substances, including opiates, while working as a nurse;

12. Reports by fellow Spartanburg Regional Medical Center employees of instances where, while at work, Mrs. Middleton:

- was visually impaired;

- was unable to walk in a straight line;

- slurred her speech;

- fell asleep on a toilet;

- and had dilated pupils.

It simply cannot be disputed that Mrs. Middleton's death was caused by her driving under the influence of drugs, in violation of South Carolina's criminal laws

## II.    PROOF OF IMPAIRMENT IN SOUTH CAROLINA

As mentioned above, several categories of evidence are used to determine whether a person has been driving under the influence.

A) Blood and/or Urine Screens

The reporters are replete with South Carolina cases where evidence of positive drug and alcohol tests was admitted as highly probative when determining whether a driver was impaired. See e.g., State v. Parris, 387 S.C. 460, 692 S.E.2d 207 (Ct. App. 2010) (finding testimony of a law enforcement officer properly admitted in a case involving reckless homicide by a driver who tested positive for painkillers and antidepressants); Gulledge v. McLaughlin, 328 S.C. 504, 492 S.E.2d 816 (Ct. App.

1997) (holding that, where the defendant had pled contributory negligence, evidence of plaintiff-driver's blood alcohol content was "obviously" probative of whether the plaintiff was driving under the influence);   State v. Salisbury, 343 S.C. 520, 541 S.E.2d 247 (2001) (finding that the trial court did not abuse its discretion in refusing a circumstantial evidence charge in the face of ample direct evidence, including a positive blood alcohol test, of the defendant's DUI); Hartfield v. Getaway Lounge & Grill, Inc., 388 S.C. 407, 697 S.E.2d 558 (2010) (finding no error in a third party tavern owner liability suit where the trial court charged the criminal statutory inference of driving under the influence based upon blood alcohol content).

It is important to recognize a significant difference in impairment by alcohol and impairment by prescription drugs.   Alcohol-induced impairment is presumed if a person's blood alcohol content reaches a certain level.   Though impairment can be proved by other categories of evidence even when a person's blood alcohol content is below the presumptive threshold, the law recognizes that it can be possible for a person to drive safely at certain blood alcohol content levels.

Many prescriptions drugs, however, carry warnings of dangerous side effects, even at "therapeutic levels."  Opiates and benzodiazepines are two such drugs.  The FDA has explained that opioids cause drowsiness, and persons should, therefore, not drive or operate dangerous machinery while under their influence. http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm095673.htm, attached as **Exhibit 21**.  Similarly, The Physicians' Desk Reference explains that Xanax and Valium, both of which are benzodiazepines, can cause drowsiness, blurred vision, and

confusion.  See  http://www.pdr.net/drug-summary/valium?druglabelid=2100&id=1260,

attached as **Exhibit 22**;

http://www.pdr.net/drug-summary/xanax?druglabelid=1873&id=1159, attached as

**Exhibit 23**.  The FDA cautions users of both drugs against operating motor vehicles

while under their influence.  See

http://www.accessdata.fda.gov/drugsatfda_docs/label/2011/018276s044,021434s006lbl.

pdf, attached as **Exhibit 24**;

http://www.accessdata.fda.gov/drugsatfda_docs/label/2008/013263s083lbl.pdf, attached

as **Exhibit 25**.

These warnings apply to the medications even at therapeutic levels; and, of
course, there is no therapeutic level for a medicine in a person for whom the medicine
has not been prescribed.

B) Observations of Vehicle Behavior

As will be discussed in more detail below, the purpose of the prohibition against
driving under the influence is to protect the safety not only of the impaired driver, but of
the innocent drivers with whom he or she shares the road.   The South Carolina
Supreme Court explained long ago that such statutes are intended "to prevent accidents
and preserve persons from injury, and the reason for it is that an intoxicated person has
so befuddled and deranged and obscured his faculties of perception, judgment, and
recognition of obligations toward his fellows as to be a menace in guiding an
instrumentality so speedy and high-powered as a modern automobile."  State v. Long,
186 S.C. 439, 195 S.E. 624, 627 (1938) (internal quotations omitted).

Not surprisingly, then, observations of unusual vehicle behavior are regularly treated as probative of whether the person was impaired. See, e.g., Lee v. Bunch, 373 S.C. 654, 647 S.E.2d 197 (2007) (blood alcohol level that was below the legal limit several hours after an accident was found to be properly admitted because its probative value was enhanced, in part, because the driver was on the wrong side of the center line and speeding at the time of the accident); Gulledge, 328 S.C. 504, 492 S.E.2d 816 (finding that the circumstances of the accident, which involved a plaintiff that struck the back of a car while passing on a two lane road, provided corroborating evidence that the plaintiff was driving while impaired); Hartfield ex rel. Hartfield v. McDonald, 381 S.C. 1, 671 S.E.2d 380 (2008) (noting that the accident occurred when the intoxicated plaintiff crossed the centerline of the highway and struck another vehicle); Salisbury, 343 S.C. 520, 541 S.E.2d 247 (law enforcement observed the intoxicated driver cross the centerline three times while speeding).

C) Observations of the Human Behavior

Observations of a driver's behavior are another common source of impairment evidence. See e.g., Parris, 387 S.C. 460, 692 S.E.2d 207 (in addition to positive drug screens, the defendant was observed to have spoken slowly, had difficulty pronouncing words, and was generally oblivious to his surroundings such that a police officer correctly surmised he was under the influence of drugs); Daley v. Ward, 303 S.C. 81, 83, 399 S.E.2d 13, 14 (Ct. App. 1990) (defendant acknowledged that though he did not think he was impaired when he chose to drive his car, a video of his behavior convinced him that he was indeed impaired); Getaway Lounge, 388 S.C. 407, 697 S.E.2d 558 (2010) (among other evidence, driver left a voicemail minutes before his deadly

accident "in which he sounded intoxicated."); Gulledge, 328 S.C. 504, 492 S.E.2d 816 (in an ultimately failed argument against the admission of a blood test, it was noted that emergency personnel testified they did not observe any indications that the plaintiff had been drinking).

Of course, the value of human behavior evidence is perhaps most simply recognized by the admissibility of field sobriety tests. See, e.g., Salisbury, 343 S.C. 520, 541 S.E.2d 247 (after failing three field sobriety tests, defendant was arrested and found to have a blood alcohol level in excess of the legal limit).

D) Presence of Physical Objects or Conditions that are Consistent with the Use of Controlled Substances

Physical evidence, such as containers, paraphernalia, smells, and the appearance of a driver is also used to determine whether a person was driving while impaired. Many times, such evidence has been used to buttress the probative value of others types of impairment evidence. See, e.g., Gulledge, 328 S.C. 504, 492 S.E.2d 816 (witness observed empty beer cans and an overturned blue cooler in proximity to the wrecked vehicle, which the court found was corroborative of other impairment evidence); Kennedy v. Griffin, 358 S.C. 122, 595 S.E.2d 248 (Ct. App. 2004) (finding that a positive marijuana test was improperly admitted in the absence of other evidence of impairment such as the presence of marijuana in the vehicle or the smell of marijuana on the driver); Salisbury, 343 S.C. at 521, 541 S.E.2d at 247 (law enforcement observed that the driver had the smell of alcohol on his breath, bloodshot eyes, and "the general appearance of being under the influence.").

E) <u>Evidence Related to a History or Habit of Use</u>

A party's history of using controlled substances also can be used to determine whether the party had been driving while impaired.  <u>See, e.g.</u>, <u>McDonald</u>, 381 S.C. at 2, 671 S.E.2d at 381 ("[The driver] was a frequent drinker who many considered an alcoholic."); <u>Getaway Lounge</u>, 388 S.C. at 410, 697 S.E.2d at 560 (in another case arising from the same wreck as <u>McDonald</u>, the court noted that the driver's wife "testified that her husband would typically start drinking around noon and would usually leave home around 4:00 or 4:30 p.m. to go to his favorite bars.").

## III.    UNDISPUTED FACTS PROVE AMANDA MIDDLETON'S IMPAIRMENT CAUSED THIS ACCIDENT

The above-described undisputed facts prove Mrs. Middleton was impaired when this accident occurred, and there are no allegations that anything other than her own actions caused the wreck.  **ECF 1**.  Each of the categories of evidence South Carolina uses to establish whether a person has been driving under the influence are present in this case.   Thus, under South Carolina law, Defendants are entitled to summary judgment.  To briefly summarize the evidence:

|  | Type of Evidence | Undisputed Facts in this Case |
|---|---|---|
| A) | **Blood and/or Urine Screens** | 1.  Urine that was drawn approximately one hour and twenty minutes after the crash tested positive for opiates and benzodiazepines.<br><br>2.  Blood that was drawn more than a day and a half after the accident was found by SLED to be positive for benzodiazepines.<br><br>3.  Blood that was drawn more than a day and a half after the accident was found by NMS Labs to be positive for |

| | Type of Evidence | Undisputed Facts in this Case |
|---|---|---|
| | | benzodiazepines. |
| B) | **Observations of Vehicle Behavior** | 1. Eyewitness testimony that Mrs. Middleton was "just all over the road" and that she was "literally going from over towards the wall all the way off the right side of the road, all the way back on the road, I mean, using all three lanes of traffic for miles."<br><br>2. Eyewitness testimony that Mrs. Middleton was travelling at speeds close to 100 MPH.<br><br>3. Eyewitness testimony that Mrs. Middleton came "flying up behind" the witness and almost rear-ended him such that the witness immediately called 911.<br><br>4. The crash sequence itself, which occurred on a clear day, involved only one car, and for which no other cause has been alleged. |
| C) | **Observations of Human Behavior** | 1. Eyewitness testimony that Mrs. Middleton's eyes were wide open and her head was nodding up and down as she drove along the interstate.<br><br>2. Eyewitness testimony that Mrs. Middleton failed to react to the sound of a car horn, which the witness blew to rouse her attention.<br><br>3. Eyewitness testimony that Mrs. Middleton failed to react in any way to the sound and feel of her vehicle travelling over the rumble strips that run along the sides of the interstate.<br><br>4. Eyewitness lay opinion testimony that, after observing Mrs. Middleton, the witness thought she was |

| | Type of Evidence | Undisputed Facts in this Case |
|---|---|---|
| | | intoxicated and was surprised she had not wrecked her vehicle earlier than she did. |
| D) | **Presence of Physical Objects or Conditions that are Consistent with the Use of Controlled Substances** | 1. Eyewitness testimony that the witness saw an unpackaged syringe and a vial of the sort where "[i]f you go get a flu shot or something they take it out and give it to you."<br><br>2. Corroborating photographic evidence of the multi-dose, reusable medicine vial the witness described.<br><br>3. Testimony that Mrs. Middleton's mother gave her Valium, Xanax, or both on the day before the accident. |
| E) | **Evidence Related to a History or Habit of Use** | 1. Fellow nurses at Mrs. Middleton's prior place of employment reported instances where, while working at a hospital just as she had been on the day of the accident, she was visibly impaired, unable to walk in a straight line, had slurred speech, had dilated pupils, and fell asleep on a toilet.<br><br>2. An investigation into Mrs. Middleton was opened by her employers after discrepancies involving prescription pads and drug diversion were noticed.<br><br>3. Mrs. Middleton quit a nursing job rather than take a drug test. |

Collectively, this undisputed evidence conclusively proves there is no genuine issue of material fact that Mrs. Middleton's "ability to drive was materially and appreciably impaired" such that she was driving "with[out] due regard for others and

[her]self," which was clearly a contributing cause of this accident and her death.  <u>See</u> <u>Kerr</u>, 330 S.C. at 143-44, 498 S.E.2d at 217-18.

Mrs. Middleton's impairment precludes recovery in this case.  Accordingly, Defendants are entitled to judgment as a matter of law.

## IV.    SOUTH CAROLINA LAW BARS PLAINTIFFS RECOVERY IN THIS CASE

Under South Carolina law, an impaired driver cannot bring a first party action for injuries suffered in an automobile accident caused by that driver's own impairment.  The law refuses to allow plaintiffs to deflect responsibility for the injuries they cause themselves when they drive under the influence.  This bar against recovery derives from two fundamental and interrelated tenets of the law: 1) illegal activities are not to be incentivized, and 2) tort law in particular is designed to protect, not endanger, the public.

### A) <u>South Carolina's Public Policy Bars Recovery by Impaired Drivers</u>

South Carolina's Legislature and its courts have together articulated an unequivocal expression of the State's public policy in regard to impaired drivers.  When considered collectively, it is clear that a recovery under the facts of this case is impermissible under South Carolina law.

### 1.    Criminal Statutes

The most direct expression of our State's public policy on this issue can be found in the South Carolina Code, which criminalizes the unprescribed possession of opiates and benzodiazepines, both of which are on the schedules of controlled substances.  <u>See</u> S.C. Code Ann. § 44-53-210 (2000); § 44-53-250 (2000); § 44-53-370(c)-(d) (Supp. 2012).  Persons in South Carolina are also subject to criminal prosecution for driving

under the influence of "any [] drug or a combination of drugs or substances which cause impairment to the extent that the person's faculties to drive a motor vehicle are materially and appreciably impaired[.]"  S.C. Code Ann. § 56-5-2930(A) (Supp. 2012). The South Carolina's Code's definition of "drug" includes any "substance intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man and animals."  S.C. Code Ann. § 44-53-110(A) (Supp. 2012).

The Code contains a host of other provisions intended to deter and punish driving by those who are impaired by drugs.  See, e.g., S.C. Code Ann. § 56-5-2910(B)(1) (courts do not have the discretion to reinstate a driver's license that has been revoked for reckless vehicular homicide if drugs and/or alcohol were involved in the accident that caused the revocation); § 56-5-2930(A)(1)-(4) (progressively increasing penalties for subsequent offenses for driving under the influence of drugs and/or alcohol); § 56-5-2945 (enhanced penalties for drivers that cause great bodily injury or death to another while driving under the influence of drugs and/or alcohol); § 56-5-2946(A) (requiring drivers to submit to breath, blood, or urine tests for the presence of drugs and/or alcohol if there is probable cause to believe the person violated § 56-5-2945); § 56-5-2947 (persons guilty of driving under the influence of drugs and/or alcohol are also guilty of child endangerment if, while under the influence, they had a passenger under the age of sixteen); § 56-5-2950(A) (imposing implied consent to a urine test for drugs in the event law enforcement suspects a driver of being under the influence of drugs); § 56-5-2990(A) (requiring the Department of Motor Vehicles to suspend a person's driver's license when the person has been convicted of driving under the influence of drugs and/or alcohol).

As these penal statutes indicate, South Carolina's Legislature has time and again expressed an unequivocal desire to protect the safety and welfare of its citizens by discouraging and punishing impaired driving.  This policy is not limited, however, to the criminal statutes.

    **2.**   **Tobias v. Sports Club, Inc.**

The South Carolina Supreme Court has also advanced the policy of promoting public safety by barring first party claims brought by plaintiffs who injure themselves because of their own impaired driving.  <u>See</u> <u>Tobias v. Sports Club, Inc.</u>, 332 S.C. 90, 504 S.E.2d 318 (1998) (barring first party claims against tavern owners who sell alcohol to intoxicated persons in violation of statutes).  <u>Id.</u> at 91, 504 S.E.2d at 319.  <u>Tobias</u> pointedly differentiated between first party claims brought by intoxicated first party plaintiffs, which it barred, and those cases brought by innocent third parties, which the court expressly explained remain viable. [3] <u>Id.</u> at 92, 504 S.E.2d at 319.

The <u>Tobias</u> opinion made clear that the purpose behind the statutes prohibiting the sale of alcohol to intoxicated persons "is to *promote public safety*, and to prevent an already intoxicated person from becoming even more intoxicated, and *thus an even greater risk to the public at large*[.]" <u>Id.</u> (emphasis added).  The court explained that the policy behind dram shop liability—encouraging tavern owners to exercise good judgment and discretion in furtherance of public safety—would not be harmed by the prohibition of first party claims.  In the court's words: "The decision to refuse to serve alcoholic beverages, beer or wine to an intoxicated patron will be unaffected by our

---

[3] To illustrate the distinction between first and third party claims: in a suit against a tavern owner, for example, an impaired driver that crashes his car into a tree would be a first party, whereas an innocent child that is run over by an impaired driver would be a third party.

decision" because "[w]e do not believe that the owner will exercise this judgment and discretion less prudently if he risks a law suit only when the intoxicated person injures others." Id. at 92, 504 S.E.2d at 320.

However, Tobias went further than simply barring first party claims on the grounds that third party claims would sufficiently promote public safety. The opinion affirmatively stated that the allowance of first party claims would be detrimental to public safety, explaining, "We [] now hold that public policy is not served by allowing the intoxicated adult patron to maintain a suit for injuries which result from his own conduct." Id. at 92, 504 S.E.2d at 319-20.

The Tobias court, therefore, recognized that the incentives created by the tort system can contravene public policy depending upon who the plaintiff is in relation to the underlying facts. The opinion ensured that the policy of public safety was promoted in two ways: first by upholding the viability of third party claims in order to influence the decisions of tavern owners for the good of the public, and then by barring first party claims in order to influence individuals to avoid endangering the public and themselves by driving while impaired. Barring first party claims encourages personal responsibility and avoids undercutting the policy of public safety advanced by allowing third party claims.

### 3.   **Lydia v. Horton**

South Carolina tort law elsewhere embraces the legal principle—expressed both in Tobias and the criminal statutes—by barring other first party claims by impaired drivers. In Lydia v. Horton, 355 S.C. 36, 583 S.E.2d 750 (2003), the South Carolina Supreme Court overturned a Court of Appeals decision that had recognized a cause of

action for first party negligent entrustment in favor of intoxicated adult plaintiffs.   In

Lydia, an intoxicated plaintiff was injured in a single car accident involving a vehicle he

had borrowed from the defendant.  Id. at 37, 583 S.E.2d at 751.

The court, citing Tobias, held that this State's public policy creates an outright bar

to an impaired plaintiff's recovery for injuries caused by that plaintiff's impairment.[4]  As

the court explained:

> We apply the [Tobias] public policy considerations to this case.  We
> disagree with the Court of Appeals' conclusion that Tobias public policy
> considerations only have bearing in comparing fault but have no bearing
> on whether or not to impose an outright bar to a first party negligent
> entrustment action.  ***The essence of this case and the Tobias case
> are the same, for in both cases, the plaintiff, who was voluntarily
> intoxicated when the accident occurred, is attempting to deflect
> [onto another] the responsibility that should be imposed upon
> himself [].***

Id. at 42, 583 S.E.2d at 754 (emphasis added).  By specifically recognizing the Tobias

policy considerations, the Supreme Court found that South Carolina's public policy of

advancing public safety necessarily includes a component of personal responsibility,

which precludes tort recovery when a person who is irresponsibly endangering the

public ends up injuring herself.

This element of personal responsibility is a long-recognized tenet of South

Carolina law: when considering the defense of voluntary intoxication to a specific intent

crime, the court explained, "To grant immunity for crimes committed while the

perpetrator is in such a voluntary state would not only mean that many offenders would

go unpunished but *would also transgress the principle of personal accountability which*

_____

[4] As will be discussed below, the Lydia opinion also held that plaintiff's comparative fault
was an additional, independently sufficient bar to recovery.  Lydia, 355 S.C. at 39, 583
S.E.2d at 752.

*is the bedrock of all law*." State v. Vaughn, 268 S.C. 119, 125-26, 232 S.E.2d 328, 331 (1977) (emphasis added).

### 4. South Carolina Contribution Among Tortfeasors Act

In 2005, the South Carolina Legislature amended the Contribution Among Tortfeasors Act to include a section that provides a particularly clear articulation of the State's public policy in regard to the illegal or illicit use of drugs. The newly enacted section explained that defendants who are less than fifty percent at fault for a tortious injury are liable only for their percentage of fault. S.C. Code Ann. § 15-38-15(A) (Supp. 2012). However, the section specifically excludes defendants whose tortious conduct involved the "illegal or illicit use, sale, or possession of drugs," and such defendants, therefore, remain jointly and severally liable for an injury.[5] S.C. Code Ann. § 15-38-15(F) (Supp. 2012).

This exclusion reflects a public policy that discourages illegal drug use, even in situations that are disproportionate. If a tortfeasor who is only one percent at fault is not entitled to the benefit of § 15-38-15(A) because of his or her illegal drug use, then the Legislature necessarily considers such drug use to be undesirable in and of itself. This, of course, comports with the criminal prohibitions, and with the policy of advancing public safety found in Tobias and Lydia.

Importantly, this provision provides a clear expression of a fundamental concept: the law's public policies do not require strict proportionality in all relations between all actors. In general terms, policies are sometimes conflicting, and only one can prevail.

---

[5] The exclusion also extends to defendants whose conduct was willful, wanton, reckless, grossly negligent, or involved the illegal use, sale, or possession of alcohol. S.C. Code Ann. § 15-38-15(F) (Supp. 2012).

In this specific instance, the tension between mathematically apportioning tort liability and protecting public safety by discouraging drug use was resolved fully in favor of protecting public safety.

B) <u>Public Policy Considerations in the Context of this Products Liability Case</u>

The instant case, however, does not present the just-described tension.  As the South Carolina Supreme Court has explained, "[P]ersonal accountability is the bedrock of all law."  <u>Vaughn</u>, 268 S.C. at 126, 232 S.E.2d at 330.  There is no genuine issue of material fact from the undisputed evidence that Mrs. Middleton was impaired by her illegal use of drugs, which caused her to wreck her vehicle.

The eyewitness, Mr. Mahon, observed her driving in a way that was entirely reckless in regard to her own safety and that of others.  Importantly, he observed human behavior that is not just consistent with impairment, but that can lead to only one conclusion: he observed an impaired individual as this crash sequence was beginning. After the crash, Mr. Mahon saw a syringe and vial.  His testimony is uncontradicted and corroborated by a photograph of the vial. Mrs. Middleton's blood and urine tested positive for drugs she had not been prescribed in a sample taken almost immediately after the accident and in ones taken more than a day and a half later.  There is no other explanation for this crash, and none is alleged.

As thoroughly described above, she was "under the influence" of these drugs within the meaning of the criminal statutes:

> Driving under the influence is therefore established by proof that defendant's ability to drive was materially and appreciably impaired.

<u>State v. Kerr</u>, 330 S.C. 132, 143-44, 498 S.E.2d 212, 217-18 (Ct. App. 1998) (internal citations omitted).  Because the evidence conclusively establishes that Mrs. Middleton

was impaired and illegally driving under the influence, the only question remaining is whether she can maintain this product liability case in light of her own illegal activity.

As the survey of South Carolina law provided above indicates, our State's Legislature and courts have consistently enforced the public policy of protecting public safety by removing every incentive for a person to drive while he or she is impaired. Protections that the law would otherwise provide do not extend to those who hurt themselves or others while they are impaired by their use of drugs (or alcohol). This comports with the State's complimentary public policy that persons must be held accountable for their own actions.

Although the law is clear and unequivocal, it is worth recognizing that application of the public policy here will not negatively impact public safety, even if Plaintiff's allegations that the seatbelt buckle was defective and unreasonably dangerous are taken as true for the purposes of this argument. Defendants will not be encouraged to design their products differently or less safely if impaired drivers are barred from bringing first party claims for injuries they cause themselves while driving under the influence. This point was made, in analogous form, in Tobias, where the South Carolina Supreme Court explained that it did "not believe that the [tavern] owner will exercise this judgment and discretion less prudently if he risks a law suit only when the intoxicated person injures others." Tobias 332 S.C. at 92, 504 S.E.2d at 320.

In just the same manner, Defendants will not design their products less safely if Plaintiff's first party suit is barred. Tort law will continue to provide a check on dangerously defective products, and if, despite all of the design work, engineering judgment, and testing that went into the seatbelt at issue, a jury could find the seatbelt

to be defective and unreasonably dangerous, then juries will have that chance in suits that are brought by plaintiffs who were not injured by their own impaired driving.  This is the precise articulation of South Carolina's public policy for which <u>Tobias</u> and <u>Lydia</u> stand.

On the other hand, if this suit is allowed to proceed, it will come at the expense of public safety.  After all, the policy considerations at play are not just those that exist between Amanda Middleton and the Defendants.  They also include the relationships between the parties and the public.  As mentioned, the assurance that Defendants maintain their obligation to the public remains by way of third party bystander and first party suits involving innocent persons not injured while engaged in dangerous illegal activity.

But, allowing the suit to proceed here will come at the expense of public safety. Though it is tragic that Mrs. Middleton passed away at a young age, her decision to drive under the influence of drugs caused this accident while also endangering the lives of the innocent passengers and drivers she encountered on I-85.  This is why the public policy against impaired driving is so clear and so strong.  South Carolina law bars Mrs. Middleton's suit, and Defendants are therefore entitled to judgment as a matter of law.

## V.    SOUTH CAROLINA'S LAW OF COMPARATIVE FAULT BARS PLAINTIFF'S RECOVERY

A) <u>Plaintiff is Barred from Recovery Because Her Fault Exceeded Any Responsibility of Defendants'</u>

Even if one ignored South Carolina's law barring recovery for impaired drivers, Defendants are entitled to summary judgment under the law of comparative negligence, which bars claims when a plaintiff's fault is greater than that of the defendants.  <u>Nelson</u>

v. Concrete Supply Co., 303 S.C. 243, 245, 399 S.E.2d 783, 784 (1991) (negligence action); Restatement (Third) of Torts: Products Liability (1998) Section 16(a), cmnt. *f* ("[T]he contributory fault of the plaintiff in causing an accident that results in defect-related increased harm is relevant in apportioning responsibility between or among the parties, according to applicable apportionment law.").

In Lydia, the court held that the fault of an impaired driver who injures himself is greater than the fault of a negligent enabler, as a matter of law.[6] Lydia, 355 S.C. at 39, 583 S.E.2d at 752.  The court explained that it could not "imagine how one could be more than fifty percent negligent in loaning his car to an intoxicated adult who subsequently injured himself." Lydia, 355 S.C at 40, 583 S.E.2d at 752.  In like fashion, there is simply no way to imagine how Mrs. Middleton, who was under the influence of drugs and wrecked her vehicle after swerving across all lanes of traffic at speeds of up to 100 MPH, was less than fifty percent at fault for her own injuries.

As described above, the evidence on this issue is undisputed and unquestionably shows that Mrs. Middleton was solely responsible for the accident.  Plaintiff has not even alleged other causes, and, thus, Mrs. Middleton's actions were the *only* cause of this crash.

B) The Crashworthiness Doctrine Does Not Modify the Comparison of Fault Under South Carolina Law

---

[6] As noted above, the Lydia court treated South Carolina's public policy and its system of comparative negligence as independent bars to the plaintiff's claims.  Lydia, 355 S.C. at 39-41, 583 S.E.2d at 752-53.

Because this case involves crashworthiness[7] allegations, Plaintiff may argue that the undisputed evidence of the cause of the accident should not be considered in a comparative fault analysis.[8]   Since there is no precedent in South Carolina on this crashworthiness issue in relation to first party claims, the Court may look to a number of sources for guidance on what South Carolina's highest court would do if presented with the issue, including, *inter alia*, canons of construction, restatements of the law, treatises, and well-considered *dicta*.  Private Mortg. Inv. Services, Inc. v. Hotel & Club Associates, Inc., 296 F.3d 308, 312 (4th Cir. 2002).  Such sources, as will be discussed, show that the South Carolina Supreme Court would join the majority of jurisdictions by requiring a plaintiff's fault be compared when claims are brought by impaired drivers.

First, however, the Court should consider the Fourth Circuit's treatment of careless driving in the context of a *third* party claim under South Carolina law.  See Jiminez v. DaimlerChrysler Corp., 269 F.3d 439 (4th Cir. 2001).  The issue in Jiminez was whether the driver/mother's fault was relevant to an apportionment of damages in a crashworthiness claim against Chrysler brought by her child, who was her passenger when the accident occurred.  After identifying the dearth of South Carolina law on the issue and the split in authority, the court stated that though it could not "be certain what rule South Carolina would adopt, [it could not] say that the district court erred" in applying the minority rule that excludes driver negligence in crashworthiness cases. Jiminez, 269 F.3d at 453.

---

[7] Congress has defined "crashworthiness" as "the protection a passenger motor vehicle gives its passengers against personal injury or death from a motor vehicle accident."  49 U.S.C. § 32301(2).

[8] It should be noted that this anticipated argument has no bearing on the bar created by South Carolina public policy that has been described above.

While the Jiminez court ruled that the driver's negligence was irrelevant to the crashworthiness claim because it could not be imputed to the deceased passenger, the court specifically invited a different result in a *first* party case brought by a negligent driver, such as the one at bar. Id. *("Perhaps [the driver's] wrongful death claim, if she ha[d] asserted it and retained, would have been reduced proportionally.")* (emphasis added).

Turning to such first party claims, the majority rule in American jurisprudence is that the negligence of the driver bringing a crashworthiness claim must be compared with that of the defendant. See, e.g., Montag v. Honda Motor Co., 75 F.3d 1414, 1419 (10th Cir.), cert. denied, 519 U.S. 814 (1996) (applying Colorado law) ("[N]o good reason exists not to allow the jury to compare [Plaintiff's] initial negligence with [Defendant's] fault in designing the seatbelt."); Whitehead v. Toyota Motor Corp., 897 S.W.2d 684, 694 (Tenn. 1995) ("The majority view is based on the belief that the fault of the defendant and of the plaintiff should be compared with each other with respect to all damages and injuries for which the conduct of each party is a cause in fact and a proximate cause."); See also Hinkamp v. American Motors Corp., 735 F.Supp. 176, 178 (E.D.N.C. 1989), aff'd, 900 F.2d 252 (4th Cir. 1990); Keltner v. Ford Motor Co., 748 F.2d 1265 (8th Cir. 1984) (applying Arkansas law); Trust Corp. of Montana v. Piper Aircraft Corp., 506 F.Supp. 1093, 1098 (D. Mont. 1981); Oltz v. Toyota Motor Sales, U.S.A., Inc., 166 Mont. 217, 531 P.2d 1341, 1343 (Mont. 1975).

This majority rule is reflected in the Restatement Third, in a comment entitled "Plaintiff's fault in cases of increased harm," which provides:

> The seriousness of plaintiff's fault and the nature of the product defect
> are relevant in apportioning the appropriate percentages between the

29

> plaintiff and the product seller.  See § 17, comment *d*.  Accordingly, the contributory fault of the plaintiff in causing an accident that results in defect-related increased harm is relevant in apportioning responsibility between or among the parties, according to *applicable apportionment law*.

Restatement Third, § 16, comment *f*.  This is an especially persuasive source because the South Carolina Supreme Court recently relied upon the <u>Restatement Third</u> in a landmark products liability case, <u>Branham v. Ford Motor Co.</u>, 390 S.C. 203, S.E.2d 5 (2010).  And, as explained above, the "applicable apportionment law" leads ineluctably to a finding that Mrs. Middleton's fault exceeded any that may exist on the part of the Defendants.

Any argument that seeks to distinguish or ignore the rules of comparative fault in cases involving allegations of enhanced injury is without support in South Carolina law and contrary to both the <u>Restatement Third</u> and the holdings of the majority of courts to have considered the issue.   Furthermore, to allow this case to proceed without consideration for the cause of the accident would amount to trying the merits of a fictitious event.  Two eyewitnesses saw Mrs. Middleton cause this accident, and she tested positive for drugs.

South Carolina's comparative negligence law bars recovery here just as it does in any case where a plaintiff's fault exceeds any responsibility on the part of the defendants.  Because the undisputed evidence is that Mrs. Middleton's illegal and reckless driving caused the accident, she is more than fifty percent responsible for her injuries.  Defendants, therefore, are entitled to judgment as a matter of law.

**CONCLUSION**

Because the undisputed facts show Plaintiff caused her own death by driving under the influence of drugs, Defendants are entitled to judgment as a matter of law. First, South Carolina tort law bars first party recovery when impaired drivers cause their own injures.  Second, the fault of an intoxicated driver who injures herself is, as a matter of law, greater than the alleged fault of any defendants.   Either ground would be sufficient, but both are present, and judgment should therefore be granted for the reasons stated above.

BOWMAN & BROOKE, LLP


By: /s/ Joel H. Smith_____
  Joel H. Smith
  Federal Bar No. 3910
  E-Mail: joel.smith@bowmanandbrooke.com
  Courtney C. Shytle
  Federal Bar No. 7148
  E-Mail: courtney.shytle@bowmanandbrooke.com
  Angela G. Strickland
  Federal Bar No. 9824
  E-Mail: angela.strickland@bowmanandbrooke.com
  1441 Main Street, Suite 1200
  Columbia, SC  29201
  (803) 726-7420

  Attorneys for Nissan Motor Co., Ltd. and Nissan North America, Inc.


  NELSON MULLINS RILEY & SCARBOROUGH

  By:/s/Deirdre S. McCool (with permission)
  Deirdre S. McCool
  Federal Bar No. 5518
  E-Mail: Deirdre.McCool@nelsonmullins.com
  151 Meeting Street, Suite 600
  Charleston, SC 29401
  (843) 853-5200

Attorney for Autoliv ASP, Inc.

Columbia, South Carolina

April 5, 2013