IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| KENT H. MIDDLETON, JR., AS PERSONAL REPRESENTATIVE OF THE ESTATE OF AMANDA MIDDLETON, <br><br> Plaintiff, <br><br> vs. <br><br> NISSAN MOTOR COMPANY, LTD., NISSAN NORTH AMERICA, INC., AUTOLIV, INC. AND AUTOLIV ASP, INC., <br><br> Defendants. | CASE NUMBER: 7:10-cv-02529-MGL <br><br><br><br> **MOTION FOR PARTIAL SUMMARY JUDGMENT** |

PLEASE TAKE NOTICE that the Plaintiff, Kent H. Middleton, Jr. as Personal Representative for Estate of Amanda Middleton, by and through his undersigned counsel moves before the Court pursuant to Fed. R. Civ. P. 56 for an order granting partial summary judgment on Plaintiff's breach of warranty cause of action. The basis of Plaintiff's motion is that the evidence in this case, even when viewed in a light most favorable to Defendants, Nissan Motor Company, LTD and Nissan North America, Inc. (collectively "Nissan Defendants") and Autoliv, Inc. and Autoliv ASP, Inc. (collectively "Autoliv"), establishes that the buckle housing unit, which is the subject of this action, failed during the warranty period. Plaintiff contends partial summary judgment is appropriate as to the warranty and breach of warranty elements, leaving the decision for the jury as to whether the breach of the warranty caused Plaintiff's damages. For the reasons set forth below, Plaintiff's Motion for Partial Summary Judgment should be granted.

1

## FACTUAL BACKGROUND

This action arises out of a single vehicle accident that occurred on Interstate 85 in Spartanburg County, South Carolina on June 3, 2008. On that morning, the decedent, Amanda Middleton, was returning home from working as a nurse. Mrs. Middleton was the driver and sole occupant of a 2000 Nissan Xterra that was traveling in the northbound lanes of I-85.

For unknown reasons, the Nissan Xterra left the paved portion of the roadway, went on to the right shoulder, and then was driven back on to the paved portion when it began to roll over. Mrs. Middleton's Xterra flipped across the cable barrier and ultimately came to rest in the southbound lanes of I-85. During the rollover event, Mrs. Middleton was thrown about in the vehicle which caused fatal injuries.

Mrs. Middleton's husband, Kent H. Middleton, Jr., brought this wrongful death action on behalf of Mrs. Middleton's beneficiaries as set forth in S.C. Code Ann. § 15-51-20 (collectively "Plaintiff"). In addition to leaving behind her husband, Kent, Mrs. Middleton was also the mother of three dependent children.

Plaintiff filed this action on September 27, 2010, alleging causes of action for negligence (Comp. ¶¶ 15-20), strict liability (Compl. ¶¶ 21-24), and breach of express and implied warranties (Compl. ¶¶ 25-27), against the Nissan Defendants as the manufacturer and distributor of the 2000 Nissan Xterra, and Autoliv, the supplier of the seatbelt buckle.

Plaintiff alleges that prior to the rollover sequence, Mrs. Middleton was belted and during the rollover the seatbelt became unlatched, causing Mrs. Middleton's fatal injuries. Plaintiff intends to offer expert testimony at trial that had Mrs. Middleton's seat belt remain latched she would have survived this rollover event. False latch is the technical term for the condition when the occupant believes the seatbelt buckle is securely latched but later becomes unlatched.

Typically, something interferes with the latching mechanism and latch plate to cause this condition. Plaintiff contends evidence supporting Mrs. Middleton's seatbelt use at the time of the collision is, among other things, the condition the seat belt was found following the collision. (Ex. 1).[1] Plaintiff also alleges a plastic chip from the buckle housing unit[2] interfered with the latching mechanism causing the false latch. The buckle housing unit with the plastic piece missing is depicted in Exhibit 2. This defect was due to either a manufacturing or design defect in regards to the buckle housing unit, which caused the plastic chip to break off the buckle housing unit.

During the discovery period in this case, Plaintiff noticed a Fed. R. Civ. P. 30(b)(6) deposition for the Nissan Defendants. One of the items contained in the 30(b)(6) deposition notice was "function, purpose, and useful life of the seatbelt system in the 2000 Xterra." (Ex. 3). In response to the 30(b)(6) notice, the Nissan Defendants designated Tsutomu Kosuge. The 30(b)(6) deposition of Mr. Kosuge was held on April 26, 2012 in Detroit, Michigan. Mr. Kosuge lives in Japan and currently works for Nissan in the "development of restraint components, which includes seat belt systems, as well as air bag systems." (Ex. 4 – Kosuge Depo. p. 6, l. 24 – p. 7, l. 15). During Mr. Kosuge's deposition, the following exchange took place regarding the Nissan's warranty policy of the seatbelt system in the 2000 Xterra:

> Q. Does – are the seat belt buckles used by Nissan in the 2000 Xterra intended to function properly for the life of the vehicle?
>
> *A. According to the Nissan warranty policy, we – the seat belts are not supposed to fail and safety performance of the seat belt is not to be compromised for 20 years.*

---

[1] The seatbelt webbing is bunched in the portion of the seatbelt system referred to as the "D" ring.
[2] The buckle housing unit is typically attached to the floor of the vehicle and contains the latching mechanism. It is the piece where the latch plate attached to the seat belt is inserted.

> Q. Does that include the plastic buckle cover – let me strike that. Does Nissan intend to that buckle cover main its integrity for that 20-year period?
>
> ***A. As I already stated, the requirement is that – that there should not be failure that will be an equivalent of a compromised safety performance or a compromised restraint performance.***
>
> Q. And that is for a 20-year period?
>
> A. Yes.
>
> Q. Does Nissan agree that the plastic buckle cover on a buckle in the Nissan Xterra should not crack from normal use such as insertion of the tongue into the buckle?
>
> ***A. If the plastic cover were to crack under normal use, that is not a desirable thing to happen.***

(Ex. 4. – Kosuge Depo. p. 14, l. 16 – p. 15, l. 21 (objections omitted) (emphasis added)).

In addition to a 30(b)(6) deposition of the Nissan Defendants, Plaintiff also noticed a 30(b)(6) deposition of the Autoliv Defendants. (Ex. 5 – Autoliv 30(b)(6) Notice). One of the items designated in the notice is "[m]aterial properties and specifications for the plastic used to mold/manufacture the plastic buckle cover on the subject buckle and similar buckles. Also, any changes to the material or specifications." (Ex. 5 – Autoliv 30(b)(6) Notice). Autoliv designated Tim Cahill as its 30(b)(6) designee. At the time of the deposition on February 9, 2012, Mr. Cahill was a principal engineer which in essence pertains to "special projects within the seatbelt development group at Autoliv." (Ex. 6 – Cahill Depo. p. 8, ll. 3-4). During the deposition, Mr. Cahill testified regarding the cycle testing of the seatbelt buckles conducted at Autoliv to ensure the seatbelt system and its components comply with the manufacturers requirements:

> Customers require us to make sure that we have a certain life cycle capability of the buckle and most customers require a 15-year life. So GM requires, for example, 75,000 cycles. Nissan required 50,000 cycles.
>
> We do that testing on equipment that is not that precise in terms of where it puts the tongue into the buckle. The air cylinder that controls the travel of the

4

> tongue into the buckle will impact certain areas of the buckle until it sees a certain force, and then stop and then latch. Then you unbuckle the button – or you unbuckle by pushing the button.

(Ex. 6 – Cahill Depo. p. 33, l. 23 – p. 34, l. 10).

Testimony continued regarding the 15-year life requirement of the seatbelt system and its components:

> Q. The 15-year life requirement for most of your customers, that applies to all of the components of the buckle, I take it. That would be for the entire restraint system?
>
> A. Right. When we test something for the cycle life, it has – it's the entire assembly. So, in other words, if we have a fail of any component in there, it's noted and we didn't pass life cycle testing.

(Ex. 6 – Cahill Depo. p. 37, ll. 9-17).

> Q. Just to be sure, the buckle cover, which is molded from plastic, as well as the push button, the design intent is such that those components will also last throughout the life of the buckle?
>
> A. Of course, yeah.
>
> Q. And you would agree that these components should not fail through normal foreseeable use throughout the life of the buckle?
>
> ***A. Well, we test to our customer specifications, we test to governmental requirements, and those requirements from our customers and the ones that we impose on ourselves are good measure to ensure that we can provide a good product to the customer that will last for the useful life of the vehicle; so 15 years, 10 years, whatever their requirements are.***
>
> Q. And this – so the answer to the question is, yes, that the plastic components should last for the – whatever the expected , whether it's 15 years or 10 years, the plastic components should withstand normal use for the life of the vehicle?
>
> ***A. Within the guidelines of normal use, yeah, that's the intent.***

(Ex. 6 – Cahill Depo. p. 39, l. 7 – p. 40, l. 10 (objections omitted) (emphasis added)).

5

Another Autoliv employee, John Hyatt, was also deposed on February 9, 2012. Mr. Hyatt is the technical manager in the European seatbelt group for Autoliv. (Ex. 7 – Hyatt Depo. p. 6, ll. 17-18). Among other topics, Mr. Hyatt testified regarding the testing and design intent of the seatbelt buckles used in the 2000 Nissan Xterra:

> Q. And you would agree with me that all the way down to the plastic covers that are on the buckles, that they have to be designed to – in such a manner to remain robust under normal expected operating or use conditions throughout the life of the vehicle.
>
> A. Yeah. The testing that we do for covers would involve temperatures, cycling. I think 90 degrees is one of the temperatures. They sit for I think it's almost a thousand hours, 960 hours. There's impact testing. That's weights dropped on the buckle heads to see if there's any damage. There's a multitude of tests that try to show the robustness of the material.
>
> ***Q. And the material should be designed such that its robust sufficient to not fracture under normal use conditions where a customer's inserting or ejecting the tongue on the seatbelt.***
>
> A. Yes.

(Ex. 7 – Hyatt Depo. p. 18, l. 11 – p. 19, l. 3 (emphasis added)).

Based on Nissan's and Autoliv's testimony through its 30(b)(6) deponent and appearance of the compromised integrity of the buckle housing unit following this collision,[3] partial summary judgment on Plaintiff's cause of action for breach of warranty is warranted.

## STANDARD OF REVIEW

The standard for summary judgment pursuant to Fed. R. Civ. P. 56 is well established. Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). "One of the

---

[3] Plaintiff also intends to offer additional evidence at trial of buckles from other Xterras which contain similar fractures to the cover of buckle housing unit.

principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The movant "bears the initial burden of showing the absence of any genuine issues of material fact . . . '[t]he burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." Boreman v. U.S., 2009 WL 775411 *3 (N.D.W. Va. 1995) (citing Celotex, 477 U.S. at 322-23). Substantive law will determine "which facts are material . . . [because] [f]actual disputes that are irrelevant and unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 247 (1986). Essentially,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 447 U.S. at 322.

The moving party is not required to accompany its summary judgment motion with affidavits. Id. at 323. Regardless, "the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment is satisfied." Id. The nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).

## ARGUMENT

For over 130 years, South Carolina has held to the principle that a retailer, whether he was ignorant of the defect or conscious of it, is bound to take back the thing or to abate the price, and to make good the damages which the buyers shall have suffered. Smith v. Regina Mfg. Corp., 396 F.2d 826 (4th Cir. 1968). Under South Carolina warranty law the Plaintiff asserts that Nissan and Autoliv breached both express warranty and implied warranties of

7

merchantability, habitability, and fitness for particular purpose. Sections 36-2-313 through 36-2-315 of the South Carolina Code provide a cause of action for breach of warranty.

In order to establish a cause of action for breach of express warranty, a plaintiff must prove (1) the existence of an express warranty, (2) breach of an express warranty, and (3) damages proximately caused by the breach. See Cox House Moving, Inc. v. Ford Motor Co., No. 7:06-1218-HMH, 2006 WL 2303182, *4 (D.S.C. 2006) (citing Besse v. Gen. Motors Corp., 317 F.Supp.2d 646, 654 n. 7 (D.S.C.2004)); see also S.C. Code Ann. § 36-2-313. To recover for breach of the implied warranty of merchantability, a plaintiff must prove (1) a merchant sold goods; (2) the goods were not "merchantable" at the time of sale; (3) the plaintiff or his property was injured by such goods; (4) the defect or other condition amounting to a breach of the implied warranty of merchantability proximately caused the injury; and (5) the plaintiff so injured gave timely notice to the seller. Thomas v. La.–Pac. Corp., 246 F.R.D. 505 (D.S.C. 2007)

The evidence of the premature failure of the seatbelt buckle cover on the 2000 Nissan Xterra is uncontroverted and supports partial summary judgment on Plaintiff's warranty claims.

I. PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S WARRANTY CLAIM IS WARRANTED WHERE THE NISSAN AND AUTOLIV WARRANTY POLICY MANDATES THE BUCKLE HOUSING COVER IS NOT TO FAIL FOR TWENTY YEARS OR THE LIFE OF THE VEHICLE

   A. *Nissan Expressly Warrants the Seat Belt System in the Subject Xterra for Twenty Years*

The Nissan Warranty Information Booklet provides:

> This warranty covers any Nissan supplied seat belt or related component, that fails to function properly during normal use within ten (10) years of the date the vehicle is delivered to the first retail buyer or put into service, which is earlier. Warranty repairs are free of charge for parts and labor.

8

"According to the Nisan warranty policy, we – the seat belts are not supposed to fail and safety performance of the seat belt is not to be compromised for 20 years." (Ex. 4 – Kosuge Depo. p. 14). The testimony of Nissan through its corporate representative confirms that Nissan warrants the function of the seatbelt buckle in the 2000 Xterra for twenty years which is a more robust warranty than set forth in writing by Nissan. The incident giving rise to this action occurred on June 4, 2008. There is no dispute that the seatbelt buckle cover failed either on or before this date. The failure of the buckle cover clearly occurred within both the written and stated express warranty periods.

The testimony of Nissan and Autoliv confirms that the proper function of the seatbelt in the 2000 Xterra includes the integrity of the plastic buckle cover. In other words a buckle cover that fails during the warranty period is not in keeping with Nissan and Autoliv's design intent for the function of the seatbelt buckle. This failure during the ordinary use of the vehicle is a breach of warranty. Therefore, partial summary judgment on Plaintiff's action for breach of express warranty as to the existence of the warranty and breach is warranted.

There is no genuine issue of material fact in this case that the buckle housing unit did not comply with Nissan's warranty. According to Nissan's warranty policy and its own testimony through Tsutomu Kosuge, Nissan's 30(b)(6) witness, the buckle housing unit (or any seat belt component) is not to fail for 20 years or the life of the vehicle. In simple terms, Nissan contends the seatbelt system or any component including the cover to the buckle housing unit should not be compromised within the 20-year life of the vehicle. However, the Middleton vehicle contained fractured portions of the cover to the buckle housing unit. In this case, the uncontradicted evidence is that following the collision the buckle housing unit's guide vanes were compromised. (Ex. 2). As a result the first two elements of Plaintiff's cause of action for

9

breach of warranty are satisfied. Based on this evidence, it should be for the jury to determine whether the breach of Nissan's warranty caused Plaintiff's damages.

Similarly, the uncontradicted evidence is that the seatbelt system failed to comply with Autoliv's warranty and design intent of the system in the 2000 Xterra. Based on the testimony quoted above, Autoliv conducts extensive testing of its seatbelt buckles and various components to comply with the manufacturer's requirements, government regulations, and Autoliv's own standards. This is done to ensure the seatbelt system and its components will withstand the normal use for the life of the vehicle, which for Nissan vehicles is 20 years. As a result, Plaintiff contends partial summary judgment on the breach of warranty action is also warranted as to Autoliv.

### B.     The Condition of the Seatbelt System in the Xterra Warrants Partial Summary on Plaintiff's Cause of Action for Breach of Implied Warranty

Under South Carolina law, "a warranty of merchantability is implied in a contract for the sale of goods if the seller is a merchant with respect to goods of that kind." Doty v. Parkway Homes, 295 S.C. 368, 368 S.E.2d 670, 671 (1988) (citing S.C. Code Ann. § 36-2-314(1)). In order to prove a breach of such implied warranty, a plaintiff must prove that "the product was not reasonably fit or safe for its intended use." Livingston v. Noland Corp., 293 S.C. 521, 362 S.E.2d 16, 18 (1987); Claytor v. General Motors Corp., 277 S.C. 259, 286 S.E.2d 129, 132 (1982); Doty, 368 S.E.2d at 671 (asserting that "[g]oods to be merchantable must be fit for the ordinary purposes for which such goods are used.") (citing S.C. Code Ann. § 36-2-314(2)(c) (1976)). Little v. Brown & Williams Tobacco Corp., 246 F.Supp. 2d (D.S.C. 2001).

Under South Carolina law and in light of the specific allegations in this case, it is immaterial whether the Plaintiff's claim is for breach of implied warranty of merchantability or implied warranty for a particular purpose. In Soaper v. Hope Industries, Inc., 424 S.E.2d 493

(1992), the South Carolina Supreme Court eliminated any question about the distinction between these two theories using the sale of an automobile as an example.

> Subsection (c) [of UCC § 2-314(2) ] tends to overlap the warranty of merchantability with that of fitness for the purpose.... [A] seller is obligated to provide goods which meet the buyer's particular purpose as made known to the seller. Under this warranty, the buyer need not communicate to the seller the particular purpose for which the goods are intended, if the circumstances are such that the latter has reason to know that purpose. For example, one buying an automobile impliedly makes known the particular purpose for which the goods are intended -transportation. If the automobile will not run, both the warranties of fitness for the purpose and merchantability are breached, for such a defective car is not of fair average quality, nor is it fit for the purpose as impliedly made known to the seller.

Id. at 495 (citing, Hawkland, A Transactional Guide to the Uniform Commercial Code, § 1.19020702 at p. 68 (1964)).

As in the example used in Soaper, the implied warranty was that the subject vehicle was both merchantable and fit for a particular purpose. A vehicle with a defective restraint system is not merchantable and not fit for the purpose of driving on the highways. The premature failure of the seatbelt buckle cover in the subject vehicle being contrary to design intent and proper function is contrary to the implied warranty that the seatbelt buckle would perform properly for the life of the vehicle. Partial summary judgment on Plaintiff's cause of action for breach of implied warranty should be granted.

## **CONCLUSION**

For these reasons, Plaintiff's motion for partial summary judgment on its cause of action for breach of warranty should be granted. Nissan warrants the seat belt system, including the cover to the buckle housing unit, for 20 years. Autoliv conducts extensive testing to comply with Nissan's requirements and to ensure the components of the seatbelt system withstand use for the life of the vehicle. The uncontradicted testimony in this action is that the integrity of the buckle housing unit on the Middleton vehicle was compromised, thereby breaching Nissan's and

11

Autoliv's warranty. As a result, Plaintiff contends summary judgment is warranted on the cause of action for breach of warranty on the basis that a warranty is established and the seat belt system in the Middleton vehicle failed to conform to the warranty. It should be a jury question as to whether the breach of this warranty caused the damages Plaintiff alleges.

>David Yarborough, Esquire
>Fed ID #7336
>William Applegate, Esquire
>Fed ID #9261
>YARBOROUGH APPLEGATE LAW FIRM
>Post Office Box 20398
>Charleston, SC 29413
>-and-
>
>PETERS, MURDAUGH, PARKER, ELTZROTH & DETRICK, P.A.
>
>BY: s/ Ronnie L. Crosby_____ __
>Ronnie L. Crosby
>Fed ID #6311
>rcrosby@pmped.com
>William F. Barnes, III
>Fed ID #10639
>wbarnes@pmped.com
>Post Office Box 457
>101 Mulberry Street East
>Hampton, SC 29924
>(803) 943-2111
>
>ATTORNEYS FOR PLAINTIFF

April 29, 2013
Hampton, South Carolina